# STAPLES *v.* UNITED STATES

No. 92–1441.   Argued November 30, 1993—Decided May 23, 1994

Thomas, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Scalia, Kennedy, and Souter, JJ., joined. Ginsburg, J., filed an opinion concurring in the judgment, in which O'Connor, J., joined, *post*, p. 620. Stevens, J., filed a dissenting opinion, in which Blackmun, J., joined, *post*, p. 624.

*Jennifer L. De Angelis* argued the cause for petitioner. With her on the brief was *Clark O. Brewster.*

*James A. Feldman* argued the cause for the United States. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Bryson,* and *John F. De Pue.*

JUSTICE THOMAS delivered the opinion of the Court.

The National Firearms Act makes it unlawful for any person to possess a machinegun that is not properly registered with the Federal Government. Petitioner contends that, to convict him under the Act, the Government should have been required to prove beyond a reasonable doubt that he knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun. We agree and accordingly reverse the judgment of the Court of Appeals.

I

The National Firearms Act (Act), 26 U. S. C. §§ 5801–5872, imposes strict registration requirements on statutorily defined "firearms." The Act includes within the term "firearm" a machinegun, § 5845(a)(6), and further defines a machinegun as "any weapon which shoots, . . . or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," § 5845(b). Thus, any fully automatic weapon is a "firearm" within the meaning of the Act.[1] Under the Act, all firearms must be registered in the National Firearms Registration and Transfer Record maintained by the Secretary of the Treasury. § 5841. Section 5861(d) makes it a crime, punish-

---

[1] As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

able by up to 10 years in prison, see § 5871, for any person to possess a firearm that is not properly registered.

Upon executing a search warrant at petitioner's home, local police and agents of the Bureau of Alcohol, Tobacco and Firearms (BATF) recovered, among other things, an AR–15 rifle. The AR–15 is the civilian version of the military's M–16 rifle, and is, unless modified, a semiautomatic weapon. The M–16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire. Many M–16 parts are interchangeable with those in the AR–15 and can be used to convert the AR–15 into an automatic weapon. No doubt to inhibit such conversions, the AR–15 is manufactured with a metal stop on its receiver that will prevent an M–16 selector switch, if installed, from rotating to the fully automatic position. The metal stop on petitioner's rifle, however, had been filed away, and the rifle had been assembled with an M–16 selector switch and several other M–16 internal parts, including a hammer, disconnector, and trigger. Suspecting that the AR–15 had been modified to be capable of fully automatic fire, BATF agents seized the weapon. Petitioner subsequently was indicted for unlawful possession of an unregistered machinegun in violation of § 5861(d).

At trial, BATF agents testified that when the AR–15 was tested, it fired more than one shot with a single pull of the trigger. It was undisputed that the weapon was not registered as required by § 5861(d). Petitioner testified that the rifle had never fired automatically when it was in his possession. He insisted that the AR–15 had operated only semiautomatically, and even then imperfectly, often requiring manual ejection of the spent casing and chambering of the next round. According to petitioner, his alleged ignorance of any automatic firing capability should have shielded him from criminal liability for his failure to register the weapon. He requested the District Court to instruct the jury that, to establish a violation of § 5861(d), the Government must prove

beyond a reasonable doubt that the defendant "knew that the gun would fire fully automatically." 1 App. to Brief for Appellant in No. 91–5033 (CA10), p. 42.

The District Court rejected petitioner's proposed instruction and instead charged the jury as follows:

> "The Government need not prove the defendant knows he's dealing with a weapon possessing every last characteristic [which subjects it][2] to the regulation. It would be enough to prove he knows that he is dealing with a dangerous device of a type as would alert one to the likelihood of regulation." Tr. 465.

Petitioner was convicted and sentenced to five years' probation and a $5,000 fine.

The Court of Appeals affirmed. Relying on its decision in *United States* v. *Mittleider*, 835 F. 2d 769 (CA10 1987), cert. denied, 485 U. S. 980 (1988), the court concluded that the Government need not prove a defendant's knowledge of a weapon's physical properties to obtain a conviction under § 5861(d). 971 F. 2d 608, 612–613 (CA10 1992). We granted certiorari, 508 U. S. 939 (1993), to resolve a conflict in the Courts of Appeals concerning the *mens rea* required under § 5861(d).

## II

### A

Whether or not § 5861(d) requires proof that a defendant knew of the characteristics of his weapon that made it a "firearm" under the Act is a question of statutory construction. As we observed in *Liparota* v. *United States*, 471 U. S. 419 (1985), "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Id.*, at 424 (citing *United States* v. *Hudson*, 7 Cranch 32

---

[2] In what the parties regard as a mistranscription, the transcript contains the word "suggested" instead of "which subjects it."

(1812)). Thus, we have long recognized that determining the mental state required for commission of a federal crime requires "construction of the statute and . . . inference of the intent of Congress." *United States* v. *Balint,* 258 U. S. 250, 253 (1922). See also *Liparota, supra,* at 423.

The language of the statute, the starting place in our inquiry, see *Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 253–254 (1992), provides little explicit guidance in this case. Section 5861(d) is silent concerning the *mens rea* required for a violation. It states simply that "[i]t shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U. S. C. § 5861(d). Nevertheless, silence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal. See *Balint, supra,* at 251 (stating that traditionally, *"scienter"* was a necessary element in every crime). See also n. 3, *infra.* On the contrary, we must construe the statute in light of the background rules of the common law, see *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 436–437 (1978), in which the requirement of some *mens rea* for a crime is firmly embedded. As we have observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Id.,* at 436 (internal quotation marks omitted). See also *Morissette* v. *United States,* 342 U. S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil").

There can be no doubt that this established concept has influenced our interpretation of criminal statutes. Indeed, we have noted that the common-law rule requiring *mens rea*

has been "followed in regard to statutory crimes even where the statutory definition did not in terms include it." *Balint, supra,* at 251–252. Relying on the strength of the traditional rule, we have stated that offenses that require no *mens rea* generally are disfavored, *Liparota, supra,* at 426, and have suggested that some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime. Cf. *United States Gypsum, supra,* at 438; *Morissette, supra,* at 263.

According to the Government, however, the nature and purpose of the Act suggest that the presumption favoring *mens rea* does not apply to this case. The Government argues that Congress intended the Act to regulate and restrict the circulation of dangerous weapons. Consequently, in the Government's view, this case fits in a line of precedent concerning what we have termed "public welfare" or "regulatory" offenses, in which we have understood Congress to impose a form of strict criminal liability through statutes that do not require the defendant to know the facts that make his conduct illegal. In construing such statutes, we have inferred from silence that Congress did not intend to require proof of *mens rea* to establish an offense.

For example, in *Balint,* we concluded that the Narcotic Act of 1914, which was intended in part to minimize the spread of addictive drugs by criminalizing undocumented sales of certain narcotics, required proof only that the defendant knew that he was selling drugs, not that he knew the specific items he had sold were "narcotics" within the ambit of the statute. See *Balint, supra,* at 254. Cf. *United States* v. *Dotterweich,* 320 U. S. 277, 281 (1943) (stating in dicta that a statute criminalizing the shipment of adulterated or misbranded drugs did not require knowledge that the items were misbranded or adulterated). As we explained in *Dotterweich, Balint* dealt with "a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conven-

tional requirement for criminal conduct—awareness of some wrongdoing." 320 U. S., at 280–281. See also *Morissette, supra,* at 252–256.

Such public welfare offenses have been created by Congress, and recognized by this Court, in "limited circumstances." *United States Gypsum, supra,* at 437. Typically, our cases recognizing such offenses involve statutes that regulate potentially harmful or injurious items. Cf. *United States* v. *International Minerals & Chemical Corp.,* 402 U. S. 558, 564–565 (1971) (characterizing *Balint* and similar cases as involving statutes regulating "dangerous or deleterious devices or products or obnoxious waste materials"). In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," *Dotterweich, supra,* at 281, he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to "ascertain at his peril whether [his conduct] comes within the inhibition of the statute." *Balint, supra,* at 254. Thus, we essentially have relied on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional *mens rea* requirements. See generally *Morissette, supra,* at 252–260.[3]

---

[3] By interpreting such public welfare offenses to require at least that the defendant know that he is dealing with some dangerous or deleterious substance, we have avoided construing criminal statutes to impose a rigorous form of strict liability. See, *e. g., United States* v. *International Minerals & Chemical Corp.,* 402 U. S. 558, 563–564 (1971) (suggesting that if a person shipping acid mistakenly thought that he was shipping distilled water, he would not violate a statute criminalizing undocumented shipping of acids). True strict liability might suggest that the defendant need not know even that he was dealing with a dangerous item. Nevertheless, we have referred to public welfare offenses as "dispensing with" or "eliminating" a *mens rea* requirement or "mental element," see, *e. g., Morissette,*

## B

The Government argues that § 5861(d) defines precisely the sort of regulatory offense described in *Balint.* In this view, all guns, whether or not they are statutory "firearms," are dangerous devices that put gun owners on notice that they must determine at their hazard whether their weapons come within the scope of the Act. On this understanding, the District Court's instruction in this case was correct, because a conviction can rest simply on proof that a defendant knew he possessed a "firearm" in the ordinary sense of the term.

The Government seeks support for its position from our decision in *United States* v. *Freed,* 401 U. S. 601 (1971), which involved a prosecution for possession of unregistered grenades under § 5861(d).[4] The defendant knew that the items in his possession were grenades, and we concluded that § 5861(d) did not require the Government to prove the defendant also knew that the grenades were unregistered. *Id.,* at 609. To be sure, in deciding that *mens rea* was not required with respect to that element of the offense, we sug-

---

342 U. S., at 250, 263; *United States* v. *Dotterweich,* 320 U. S. 277, 281 (1943), and have described them as strict liability crimes, *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 437 (1978). While use of the term "strict liability" is really a misnomer, we have interpreted statutes defining public welfare offenses to eliminate the requirement of *mens rea;* that is, the requirement of a "guilty mind" with respect to an element of a crime. Under such statutes we have not required that the defendant know the facts that make his conduct fit the definition of the offense. Generally speaking, such knowledge is necessary to establish *mens rea,* as is reflected in the maxim *ignorantia facti excusat.* See generally J. Hawley & M. McGregor, Criminal Law 26–30 (1899); R. Perkins, Criminal Law 785–786 (2d ed. 1969); G. Williams, Criminal Law: The General Part 113–174 (1953). Cf. *Queen* v. *Tolson,* 23 Q. B. 168, 187 (1889) (Stephen, J.) ("[I]t may, I think, be maintained that in every case knowledge of fact [when not appearing in the statute] is to some extent an element of criminality as much as competent age and sanity").

[4] A grenade is a "firearm" under the Act. 26 U. S. C. §§ 5845(a)(8), 5845(f)(1)(B).

gested that the Act "is a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Ibid.* Grenades, we explained, "are highly dangerous offensive weapons, no less dangerous than the narcotics involved in *United States* v. *Balint.*" *Ibid.* But that reasoning provides little support for dispensing with *mens rea* in this case.

As the Government concedes, *Freed* did not address the issue presented here. In *Freed,* we decided only that § 5861(d) does not require proof of knowledge that a firearm is *unregistered.* The question presented by a defendant who possesses a weapon that is a "firearm" for purposes of the Act, but who knows only that he has a "firearm" in the general sense of the term, was not raised or considered. And our determination that a defendant need not know that his weapon is unregistered suggests no conclusion concerning whether § 5861(d) requires the defendant to know of the features that make his weapon a statutory "firearm"; different elements of the same offense can require different mental states. See *Liparota,* 471 U. S., at 423, n. 5; *United States* v. *Bailey,* 444 U. S. 394, 405–406 (1980). See also W. La-Fave & A. Scott, Handbook on Criminal Law 194–195 (1972). Moreover, our analysis in *Freed* likening the Act to the public welfare statute in *Balint* rested entirely on the assumption that the defendant *knew* that he was dealing with hand grenades—that is, that he knew he possessed a particularly dangerous type of weapon (one within the statutory definition of a "firearm"), possession of which was not entirely "innocent" in and of itself. 401 U. S., at 609. The predicate for that analysis is eliminated when, as in this case, the very question to be decided is *whether* the defendant must know of the particular characteristics that make his weapon a statutory firearm.

Notwithstanding these distinctions, the Government urges that *Freed*'s logic applies because guns, no less than gre-

nades, are highly dangerous devices that should alert their owners to the probability of regulation. But the gap between *Freed* and this case is too wide to bridge. In glossing over the distinction between grenades and guns, the Government ignores the particular care we have taken to avoid construing a statute to dispense with *mens rea* where doing so would "criminalize a broad range of apparently innocent conduct." *Liparota*, 471 U. S., at 426. In *Liparota*, we considered a statute that made unlawful the unauthorized acquisition or possession of food stamps. We determined that the statute required proof that the defendant knew his possession of food stamps was unauthorized, largely because dispensing with such a *mens rea* requirement would have resulted in reading the statute to outlaw a number of apparently innocent acts. *Ibid.* Our conclusion that the statute should not be treated as defining a public welfare offense rested on the commonsense distinction that a "food stamp can hardly be compared to a hand grenade." *Id.*, at 433.

Neither, in our view, can all guns be compared to hand grenades. Although the contrast is certainly not as stark as that presented in *Liparota*, the fact remains that there is a long tradition of widespread lawful gun ownership by private individuals in this country. Such a tradition did not apply to the possession of hand grenades in *Freed* or to the selling of dangerous drugs that we considered in *Balint*. See also *International Minerals*, 402 U. S., at 563–565; *Balint*, 258 U. S., at 254. In fact, in *Freed* we construed § 5861(d) under the assumption that "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Freed, supra,* at 609. Here, the Government essentially suggests that we should interpret the section under the altogether different assumption that "one would hardly be surprised to learn that owning a gun is not an innocent act." That proposition is simply not supported by common experience. Guns in general are not "deleterious devices or products or obnoxious waste materials," *International Minerals,*

*supra,* at 565, that put their owners on notice that they stand "in responsible relation to a public danger," *Dotterweich,* 320 U. S., at 281.

The Government protests that guns, unlike food stamps, but like grenades and narcotics, are potentially harmful devices.[5] Under this view, it seems that *Liparota's* concern for criminalizing ostensibly innocuous conduct is inapplicable whenever an item is sufficiently dangerous—that is, dangerousness alone should alert an individual to probable regulation and justify treating a statute that regulates the dangerous device as dispensing with *mens rea.* But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. Of course, we might surely classify certain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to

---

[5] The dissent's assertions to the contrary notwithstanding, the Government's position, "[a]ccurately identified," *post,* at 632, is precisely that "guns in general" are dangerous items. The Government, like the dissent, cites *Sipes* v. *United States,* 321 F. 2d 174, 179 (CA8), cert. denied, 375 U. S. 913 (1963), for the proposition that a defendant's knowledge that the item he possessed "was a gun" is sufficient for a conviction under § 5861(d). Brief for United States 21. Indeed, the Government argues that "guns" should be placed in the same category as the misbranded drugs in *Dotterweich* and the narcotics in *Balint* because "'one would hardly be surprised to learn' (*Freed,* 401 U. S. at 609) that there are laws that affect one's rights of gun ownership." Brief for United States 22. The dissent relies upon the Government's repeated contention that the statute requires knowledge that "the item at issue was highly dangerous and of a type likely to be subject to regulation." *Id.,* at 9. But that assertion merely patterns the general language we have used to describe the *mens rea* requirement in public welfare offenses and amounts to no more than an assertion that the statute should be treated as defining a public welfare offense.

regulation—as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in *Freed.* But precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions, their destructive potential, while perhaps even greater than that of some items we would classify along with narcotics and hand grenades, cannot be said to put gun owners sufficiently on notice of the likelihood of regulation to justify interpreting § 5861(d) as not requiring proof of knowledge of a weapon's characteristics.[6]

---

[6] The dissent asserts that the question is not whether all guns are deleterious devices, but whether a gun "such as the one possessed by petitioner," *post,* at 632 (which the dissent characterizes as a "semiautomatic weapon that [is] readily convertible into a machinegun," *post,* at 624, 633, 640), is such a device. If the dissent intends to suggest that the category of readily convertible semiautomatics provides the benchmark for defining the knowledge requirement for § 5861(d), it is difficult to see how it derives that class of weapons as a standard. As explained above, see n. 5, *supra,* the Government's argument has nothing to do with this ad hoc category of weapons. And the statute certainly does not suggest that any significance should attach to readily convertible semiautomatics, for that class bears no relation to the definitions in the Act. Indeed, in the absence of any definition, it is not at all clear what the contours of this category would be. The parties assume that virtually *all* semiautomatics may be converted into automatics, and limiting the class to those "readily" convertible provides no real guidance concerning the required *mens rea.* In short, every owner of a semiautomatic rifle or handgun would potentially meet such a *mens rea* test.

But the dissent apparently does not conceive of the *mens rea* requirement in terms of specific categories of weapons at all, and rather views it as a more fluid concept that does not require delineation of any concrete elements of knowledge that will apply consistently from case to case. The dissent sees no need to define a class of items the knowing possession of which satisfies the *mens rea* element of the offense, for in the dissent's view the exact content of the knowledge requirement can be left to the jury in each case. As long as the jury concludes that the item in a given case is "sufficiently dangerous to alert [the defendant] to the likelihood of regulation," *post,* at 637, the knowledge requirement is satisfied. See also *post,* at 624, 639, 640. But the *mens rea* requirement under a criminal statute is a question of law, to be determined by the court. Our decisions

On a slightly different tack, the Government suggests that guns are subject to an array of regulations at the federal, state, and local levels that put gun owners on notice that they must determine the characteristics of their weapons and comply with all legal requirements.[7]  But regulation in itself is not sufficient to place gun ownership in the category of the sale of narcotics in *Balint*.  The food stamps at issue in *Liparota* were subject to comprehensive regulations, yet we did not understand the statute there to dispense with a *mens rea* requirement.  Moreover, despite the overlay of legal restrictions on gun ownership, we question whether regulations on guns are sufficiently intrusive that they impinge upon the common experience that owning a gun is usually licit and blameless conduct.  Roughly 50 percent of

suggesting that public welfare offenses require that the defendant know that he stands in "responsible relation to a public danger," *Dotterweich,* 320 U. S., at 281, in no way suggest that what constitutes a public danger is a jury question.  It is for courts, through interpretation of the statute, to define the *mens rea* required for a conviction.  That task cannot be reduced to setting a general "standard," *post,* at 637, that leaves, it to the jury to determine, based presumably on the jurors' personal opinions,, whether the items involved in a particular prosecution are sufficiently dangerous to place a person on notice of regulation.

Moreover, as our discussion above should make clear, to determine as a threshold matter whether a particular statute defines a public welfare offense, a court must have in view some category of dangerous and deleterious devices that will be assumed to alert an individual that he stands in "responsible relation to a public danger."  *Dotterweich, supra,* at 281.  The truncated *mens rea* requirement we have described applies precisely because the *court* has determined that the statute regulates in a field where knowing possession of some general class of items should alert individuals to probable regulation.  Under the dissent's approach, however, it seems that every regulatory statute potentially could be treated as a public welfare offense as long as the jury—not the court—ultimately determines that the specific items involved in a prosecution were sufficiently dangerous.

[7] See, *e. g.,* 18 U. S. C. §§ 921–928 (1988 ed. and Supp. IV) (requiring licensing of manufacturers, importers, and dealers of guns and regulating the sale, possession, and interstate transportation of certain guns).

American homes contain at least one firearm of some sort,[8] and in the vast majority of States, buying a shotgun or rifle is a simple transaction that would not alert a person to regulation any more than would buying a car.[9]

. If we were to accept as a general rule the Government's suggestion that dangerous and regulated items place their owners under an obligation to inquire at their peril into compliance with regulations, we would undoubtedly reach some untoward results. Automobiles, for example, might also be termed "dangerous" devices and are highly regulated at both the state and federal levels. Congress might see fit to criminalize the violation of certain regulations concerning automobiles, and thus might make it a crime to operate a vehicle without a properly functioning emission control system. But we probably would hesitate to conclude on the basis of silence that Congress intended a prison term to apply to a car owner whose vehicle's emissions levels, wholly unbeknownst to him, began to exceed legal limits between regular inspection dates.

Here, there can be little doubt that, as in *Liparota*, the Government's construction of the statute potentially would impose criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of weapons in their

---

[8] See U. S. Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 209 (1992) (Table 2.58).

[9] For example, as of 1990, 39 States allowed adult residents, who are not felons or mentally infirm, to purchase a rifle or shotgun simply with proof of identification (and in some cases a simultaneous application for a permit). See U. S. Dept. of Justice, Bureau of Justice Statistics, Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms 114, Exh. B.4 (1990); U. S. Congress, Office of Technology Assessment, Automated Record Checks of Firearm Purchasers 27 (July 1991). See also M. Cooper, Reassessing the Nation's Gun Laws, Editorial Research Reports 158, 160 (Jan.–Mar. 1991) (table) (suggesting the total is 41 States); Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms, State Laws and Published Ordinances—Firearms (19th ed. 1989).

possession—makes their actions entirely innocent.[10] The Government does not dispute the contention that virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear, into a machinegun within the meaning of the Act. Cf. *United States* v. *Anderson*, 885 F. 2d 1248, 1251, 1253–1254 (CA5 1989) (en banc). Such a gun may give no externally visible indication that it is fully automatic. See *United States* v. *Herbert*, 698 F. 2d 981, 986 (CA9), cert. denied, 464 U. S. 821 (1983). But in the Government's view, any person who has purchased what he believes to be a semiautomatic rifle or handgun, or who simply has inherited a gun from a relative and left it untouched in an attic or basement, can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be an automatic.

We concur in the Fifth Circuit's conclusion on this point: "It is unthinkable to us that Congress intended to subject such law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment if . . . what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to have worn down into or been secretly modified to be a fully automatic weapon." *Anderson, supra*, at 1254. As we noted in *Morissette*, the "purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction." 342 U. S., at 263.[11] We are reluctant to impute that purpose to

---

[10] We, of course, express no view concerning the inferences a jury may have drawn regarding petitioner's knowledge from the evidence in this case.

[11] The Government contends that Congress intended precisely such an aid to obtaining convictions, because requiring proof of knowledge would place too heavy a burden on the Government and obstruct the proper functioning of § 5861(d). Cf. *United States* v. *Balint*, 258 U. S. 250, 254 (1922) (difficulty of proving knowledge suggests Congress did not intend to require *mens rea*). But knowledge can be inferred from circumstantial

Congress where, as here, it would mean easing the path to convicting persons whose conduct would not even alert them to the probability of strict regulation in the form of a statute such as § 5861(d).

## C

The potentially harsh penalty attached to violation of § 5861(d)—up to 10 years' imprisonment—confirms our reading of the Act. Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea.* Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary. See, *e. g., Commonwealth* v. *Raymond,* 97 Mass. 567 (1867) (fine of up to $200 or six months in jail, or both); *Commonwealth* v. *Farren,* 91 Mass. 489 (1864) (fine); *People* v. *Snowburger,* 113 Mich. 86, 71 N. W. 497 (1897) (fine of up to $500 or incarceration in county jail).[12]

As commentators have pointed out, the small penalties attached to such offenses logically complemented the absence of a *mens rea* requirement: In a system that generally re-

---

evidence, including any external indications signaling the nature of the weapon. And firing a fully automatic weapon would make the regulated characteristics of the weapon immediately apparent to its owner. In short, we are confident that when the defendant knows of the characteristics of his weapon that bring it within the scope of the Act, the Government will not face great difficulty in proving that knowledge. Of course, if Congress thinks it necessary to reduce the Government's burden at trial to ensure proper enforcement of the Act, it remains free to amend § 5861(d) by explicitly eliminating a *mens rea* requirement.

[12] Leading English cases developing a parallel theory of regulatory offenses similarly involved violations punishable only by fine or short-term incarceration. See, *e. g., Queen* v. *Woodrow,* 15 M. & W. 404, 153 Eng. Rep. 907 (Ex. 1846) (fine of £200 for adulterated tobacco); *Hobbs* v. *Winchester Corp.,* [1910] 2 K. B. 471 (maximum penalty of three months' imprisonment for sale of unwholesome meat).

quires a "vicious will" to establish a crime, 4 W. Blackstone, Commentaries *21, imposing severe punishments for offenses that require no *mens rea* would seem incongruous. See Sayre, Public Welfare Offenses, 33 Colum. L. Rev. 55, 70 (1933). Indeed, some courts justified the absence of *mens rea* in part on the basis that the offenses did not bear the same punishments as "infamous crimes," *Tenement House Dept.* v. *McDevitt*, 215 N. Y. 160, 168, 109 N. E. 88, 90 (1915) (Cardozo, J.), and questioned whether imprisonment was compatible with the reduced culpability required for such regulatory offenses. See, *e. g., People ex rel. Price* v. *Sheffield Farms-Slawson-Decker Co.*, 225 N. Y. 25, 32–33, 121 N. E. 474, 477 (1918) (Cardozo, J.); *id.*, at 35, 121 N. E., at 478 (Crane, J., concurring) (arguing that imprisonment for a crime that requires no *mens rea* would stretch the law regarding acts *mala prohibita* beyond its limitations).[13]  Similarly, commentators collecting the early cases have argued that offenses punishable by imprisonment cannot be understood to be public welfare offenses, but must require *mens rea*. See R. Perkins, Criminal Law 793–798 (2d ed. 1969) (suggesting that the penalty should be the starting point in determining whether a statute describes a public welfare offense); Sayre, *supra*, at 72 ("Crimes punishable with prison sentences . . . ordinarily require proof of a guilty intent").[14]

In rehearsing the characteristics of the public welfare offense, we, too, have included in our consideration the punishments imposed and have noted that "penalties commonly are relatively small, and conviction does no grave damage to an

---

[13] Cf. *Queen* v. *Tolson*, 23 Q. B., at 177 (Wills, J.) (In determining whether a criminal statute dispenses with *mens rea*, "the nature and extent of the penalty attached to the offence may reasonably be considered.  There is nothing that need shock any mind in the payment of a small pecuniary penalty by a person who has unwittingly done something detrimental to the public interest").

[14] But see, *e. g., State* v. *Lindberg*, 125 Wash. 51, 215 P. 41 (1923) (applying the public welfare offense rationale to a felony).

offender's reputation." *Morissette*, 342 U. S., at 256.[15] We have even recognized that it was "[u]nder such considerations" that courts have construed statutes to dispense with *mens rea. Ibid.*

Our characterization of the public welfare offense in *Morissette* hardly seems apt, however, for a crime that is a felony, as is violation of § 5861(d).[16] After all, "felony" is, as we noted in distinguishing certain common-law crimes from public welfare offenses, "'as bad a word as you can give to man or thing.'" *Id.*, at 260 (quoting 2 F. Pollock & F. Maitland, History of English Law 465 (2d ed. 1899)). Close adherence to the early cases described above might suggest that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense. In this view, absent a clear statement from Congress that *mens rea* is not required, we should not apply the public welfare offense rationale to interpret any statute defining a felony offense as dispensing with *mens rea.* But see *United States* v. *Balint*, 258 U. S. 250 (1922).

We need not adopt such a definitive rule of construction to decide this case, however. Instead, we note only that where, as here, dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* require-

---

[15] See also *United States Gypsum*, 438 U. S., at 442, n. 18 (noting that an individual violation of the Sherman Antitrust Act is a felony punishable by three years in prison or a fine not exceeding $100,000 and stating that "[t]he severity of these sanctions provides further support for our conclusion that the [Act] should not be construed as creating strict-liability crimes"). Cf. *Holdridge* v. *United States*, 282 F. 2d 302, 310 (CA8 1960) (Blackmun, J.) ("[W]here a federal criminal statute omits mention of intent and . . . where the penalty is relatively small, where conviction does not gravely besmirch, [and] where the statutory crime is not one taken over from the common law, . . . the statute can be construed as one not requiring criminal intent").

[16] Title 18 U. S. C. § 3559 makes any crime punishable by more than one year in prison a felony.

ment. In such a case, the usual presumption that a defendant must know the facts that make his conduct illegal should apply.

### III

In short, we conclude that the background rule of the common law favoring *mens rea* should govern interpretation of § 5861(d) in this case. Silence does not suggest that Congress dispensed with *mens rea* for the element of § 5861(d) at issue here. Thus, to obtain a conviction, the Government should have been required to prove that petitioner knew of the features of his AR–15 that brought it within the scope of the Act.[17]

We emphasize that our holding is a narrow one. As in our prior cases, our reasoning depends upon a commonsense evaluation of the nature of the particular device or substance Congress has subjected to regulation and the expectations that individuals may legitimately have in dealing with the regulated items. In addition, we think that the penalty attached to § 5861(d) suggests that Congress did not intend to eliminate a *mens rea* requirement for violation of the section. As we noted in *Morissette:* "Neither this Court nor,

---

[17] In reaching our conclusion, we find it unnecessary to rely on the rule of lenity, under which an ambiguous criminal statute is to be construed in favor of the accused. That maxim of construction "is reserved for cases where, '[a]fter "seiz[ing] every thing from which aid can be derived,"' the Court is 'left with an ambiguous statute.'" *Smith* v. *United States*, 508 U. S. 223, 239 (1993) (quoting *United States* v. *Bass*, 404 U. S. 336, 347 (1971), in turn quoting *United States* v. *Fisher*, 2 Cranch 358, 386 (1805)). See also *United States* v. *R. L. C.*, 503 U. S. 291, 311 (1992) (THOMAS, J., concurring in part and concurring in judgment); *Chapman* v. *United States*, 500 U. S. 453, 463 (1991) (rule of lenity inapplicable unless there is a "'grievous ambiguity or uncertainty'" in the statute). Here, the background rule of the common law favoring *mens rea* and the substantial body of precedent we have developed construing statutes that do not specify a mental element provide considerable interpretive tools from which we can "seize aid," and they do not leave us with the ultimate impression that § 5861(d) is "grievous[ly]" ambiguous. Certainly, we have not concluded in the past that statutes silent with respect to *mens rea* are ambiguous. See, *e. g.*, *United States* v. *Balint*, 258 U. S. 250 (1922).

so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." 342 U. S., at 260. We attempt no definition here, either. We note only that our holding depends critically on our view that if Congress had intended to make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons, and to subject them to lengthy prison terms, it would have spoken more clearly to that effect. Cf. *United States* v. *Harris*, 959 F. 2d 246, 261 (CADC), cert. denied, 506 U. S. 932 (1992).

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE GINSBURG, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

The statute petitioner Harold E. Staples is charged with violating, 26 U. S. C. § 5861(d), makes it a crime for any person to "receive or possess a firearm which is not registered to him." Although the word "knowingly" does not appear in the statute's text, courts generally assume that Congress, absent a contrary indication, means to retain a *mens rea* requirement. *Ante,* at 606; see *Liparota* v. *United States*, 471 U. S. 419, 426 (1985); *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 437–438 (1978).[1] Thus, our holding in *United States* v. *Freed*, 401 U. S. 601 (1971), that § 5861(d) does not require proof of knowledge that the firearm is unregistered, rested on the premise that the defendant indeed

[1] Contrary to the dissent's suggestion, we have not confined the presumption of *mens rea* to statutes codifying traditional common-law offenses, but have also applied the presumption to offenses that are "entirely a creature of statute," *post,* at 625, such as those at issue in *Liparota, Gypsum,* and, most recently, *Posters 'N' Things, Ltd.* v. *United States, ante,* at 522–523.

knew the items he possessed were hand grenades.  *Id.,* at 607; *id.,* at 612 (Brennan, J., concurring in judgment) ("The Government and the Court agree that the prosecutor must prove knowing possession of the items and also knowledge that the items possessed were hand grenades.").

Conviction under § 5861(d), the Government accordingly concedes, requires proof that Staples "knowingly" possessed the machinegun.  Brief for United States 23.  The question before us is not *whether* knowledge of possession is required, but what level of knowledge suffices: (1) knowledge simply of possession of the object; (2) knowledge, in addition, that the object is a dangerous weapon; (3) knowledge, beyond dangerousness, of the characteristics that render the object subject to regulation, for example, awareness that the weapon is a machinegun.[2]

Recognizing that the first reading effectively dispenses with *mens rea,* the Government adopts the second, contending that it avoids criminalizing "apparently innocent conduct," *Liparota, supra,* at 426, because under the second reading, "a defendant who possessed what he thought was a toy or a violin case, but which in fact was a machinegun, could not be convicted."  Brief for United States 23.  The Government, however, does not take adequate account of the "widespread lawful gun ownership" Congress and the States have allowed to persist in this country.  See *United States* v. *Harris,* 959 F. 2d 246, 261 (CADC) *(per curiam),* cert. denied, 506 U. S. 932 (1992).  Given the notable lack of comprehensive regulation, "mere unregistered possession of certain types of [regulated weapons]—often [difficult to dis-

---

[2] Some Courts of Appeals have adopted a variant of the third reading, holding that the Government must show that the defendant knew the gun was a machinegun, but allowing inference of the requisite knowledge where a visual inspection of the gun would reveal that it has been converted into an automatic weapon.  See *United States* v. *O'Mara,* 963 F. 2d 1288, 1291 (CA9 1992); *United States* v. *Anderson,* 885 F. 2d 1248, 1251 (CA5 1989) (en banc).

tinguish] from other, [nonregulated] types," has been held inadequate to establish the requisite knowledge. See 959 F. 2d, at 261.

The Nation's legislators chose to place under a registration requirement only a very limited class of firearms, those they considered especially dangerous. The generally "dangerous" character of all guns, the Court therefore observes, *ante*, at 611–612, did not suffice to give individuals in Staples' situation cause to inquire about the need for registration. Cf. *United States* v. *Balint*, 258 U. S. 250 (1922) (requiring reporting of sale of strictly regulated narcotics, opium and cocaine). Only the third reading, then, suits the purpose of the *mens rea* requirement—to shield people against punishment for apparently innocent activity.[3]

The indictment in Staples' case charges that he "knowingly received and possessed firearms." 1 App. to Brief for Appellant in No. 91–5033 (CA10), p. 1.[4] "Firearms" has a

---

[3] The *mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, "deeply rooted in the American legal system," that, ordinarily, "ignorance of the law or a mistake of law is no defense to criminal prosecution." *Cheek* v. *United States*, 498 U. S. 192, 199 (1991). Cf. *United States* v. *Freed*, 401 U. S. 601, 612 (1971) (Brennan, J., concurring in judgment) ("If the ancient maxim that 'ignorance of the law is no excuse' has any residual validity, it indicates that the ordinary intent requirement—*mens rea*—of the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy."). The maxim explains why some "innocent" actors—for example, a defendant who knows he possesses a weapon with all of the characteristics that subject it to registration, but was unaware of the registration requirement, or thought the gun was registered—may be convicted under § 5861(d), see *post*, at 638. Knowledge of whether the gun was registered is so closely related to knowledge of the registration requirement that requiring the Government to prove the former would in effect require it to prove knowledge of the law. Cf. *Freed*, *supra*, at 612–614 (Brennan, J., concurring in judgment).

[4] The indictment charged Staples with possession of two unregistered machineguns, but the jury found him guilty of knowingly possessing only one of them. Tr. 477.

circumscribed statutory definition. See 26 U. S. C. § 5845(a). The "firear[m]" the Government contends Staples possessed in violation of § 5861(d) is a machinegun. See § 5845(a)(6). The indictment thus effectively charged that Staples *knowingly possessed a machinegun.* "Knowingly possessed" logically means "possessed and knew that he possessed." The Government can reconcile the jury instruction[5] with the indictment only on the implausible assumption that the term "firear[m]" has two different meanings when used once in the same charge—simply "gun" when referring to what petitioner knew, and "machinegun" when referring to what he possessed. See Cunningham, Levi, Green, & Kaplan, Plain Meaning and Hard Cases, 103 Yale L. J. 1561, 1576–1577 (1994); cf. *Ratzlaf* v. *United States,* 510 U. S. 135, 143 (1994) (construing statutory term to bear same meaning "each time it is called into play").

For these reasons, I conclude that conviction under § 5861(d) requires proof that the defendant knew he possessed not simply a gun, but a machinegun. The indictment in this case, but not the jury instruction, properly described this knowledge requirement. I therefore concur in the Court's judgment.

---

[5] The trial court instructed the jury:

"[A] person is knowingly in possession of a thing if his possession occurred voluntarily and intentionally and not because of mistake or accident or other innocent reason. The purpose of adding the word 'knowingly' is to insure that no one can be convicted of possession of a firearm he did not intend to possess. The Government need not prove the defendant knows he's dealing with a weapon possessing every last characteristic [which subjects it] to the regulation. It would be enough to prove he knows that he is dealing with a dangerous device of a type as would alert one to the likelihood of regulation. If he has such knowledge and if the particular item is, in fact, regulated, then that person acts at his peril. Mere possession of an unregistered firearm is a violation of the law of the United States, and it is not necessary for the Government to prove that the defendant knew that the weapon in his possession was a firearm within the meaning of the statute, only that he knowingly possessed the firearm." *Id.,* at 465.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

To avoid a slight possibility of injustice to unsophisticated owners of machineguns and sawed-off shotguns, the Court has substituted its views of sound policy for the judgment Congress made when it enacted the National Firearms Act (or Act). Because the Court's addition to the text of 26 U. S. C. § 5861(d) is foreclosed by both the statute and our precedent, I respectfully dissent.

The Court is preoccupied with guns that "generally can be owned in perfect innocence." *Ante,* at 611. This case, however, involves a semiautomatic weapon that was readily convertible into a machinegun—a weapon that the jury found to be "'a dangerous device of a type as would alert one to the likelihood of regulation.'" *Ante,* at 604. These are not guns "of some sort" that can be found in almost "50 percent of American homes." *Ante,* at 613–614.[1] They are particularly dangerous—indeed, a substantial percentage of the unregistered machineguns now in circulation are converted semiautomatic weapons.[2]

The question presented is whether the National Firearms Act imposed on the Government the burden of proving beyond a reasonable doubt not only that the defendant knew he possessed a dangerous device sufficient to alert him to

---

[1] Indeed, only about 15 percent of all the guns in the United States are semiautomatic. See National Rifle Association, Fact Sheet, Semi-Automatic Firearms 1 (Feb. 1, 1994). Although it is not known how many of those weapons are readily convertible into machineguns, it is obviously a lesser share of the total.

[2] See U. S. Dept. of Justice, Attorney General's Task Force on Violent Crime: Final Report 29, 32 (Aug. 17, 1981) (stating that over an 18-month period over 20 percent of the machineguns seized or purchased by the Bureau of Alcohol, Tobacco and Firearms had been converted from semiautomatic weapons by "simple tool work or the addition of readily available parts") (citing U. S. Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms, Firearms Case Summary (Washington: U. S. Govt. Printing Office 1981)).

regulation, but also that he knew it had all the characteristics of a "firearm" as defined in the statute. Three unambiguous guideposts direct us to the correct answer to that question: the text and structure of the Act, our cases construing both this Act and similar regulatory legislation, and the Act's history and interpretation.

## I

Contrary to the assertion by the Court, the text of the statute does provide "explicit guidance in this case." Cf. *ante*, at 605. The relevant section of the Act makes it "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U. S. C. § 5861(d). Significantly, the section contains no knowledge requirement, nor does it describe a common-law crime.

The common law generally did not condemn acts as criminal unless the actor had "an evil purpose or mental culpability," *Morissette* v. *United States*, 342 U. S. 246, 252 (1952), and was aware of all the facts that made the conduct unlawful, *United States* v. *Balint*, 258 U. S. 250, 251–252 (1922). In interpreting statutes that codified traditional common-law offenses, courts usually followed this rule, even when the text of the statute contained no such requirement. *Ibid.* Because the offense involved in this case is entirely a creature of statute, however, "the background rules of the common law," cf. *ante*, at 605, do not require a particular construction, and critically different rules of construction apply. See *Morissette* v. *United States*, 342 U. S., at 252–260.

In *Morissette*, Justice Jackson outlined one such interpretive rule:

> "Congressional silence as to mental elements in an Act merely adopting into federal statutory law a concept of crime already . . . well defined in common law and statutory interpretation by the states may warrant quite contrary inferences than the same silence in creating an of-

fense new to general law, for whose definition the courts have no guidance except the Act." *Id.*, at 262.

Although the lack of an express knowledge requirement in § 5861(d) is not dispositive, see *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 438 (1978), its absence suggests that Congress did not intend to require proof that the defendant knew all of the facts that made his conduct illegal.[3]

The provision's place in the overall statutory scheme, see *Crandon* v. *United States*, 494 U. S. 152, 158 (1990), confirms this intention. In 1934, when Congress originally enacted the statute, it limited the coverage of the 1934 Act to a relatively narrow category of weapons such as submachineguns and sawed-off shotguns—weapons characteristically used only by professional gangsters like Al Capone, Pretty Boy Floyd, and their henchmen.[4] At the time, the Act would have had little application to guns used by hunters or guns kept at home as protection against unwelcome intruders.[5]

---

[3] The Seventh Circuit's comment in a similar case is equally apt here: "The crime is possessing an unregistered firearm—not 'knowingly' possessing an unregistered firearm, or possessing a weapon knowing it to be a firearm, or possessing a firearm knowing it to be unregistered. . . . [Petitioner's] proposal is not that we *interpret* a knowledge or intent requirement in § 5861(d); it is that we *invent* one." *United States* v. *Ross*, 917 F. 2d 997, 1000 (1990) *(per curiam)* (emphasis in original), cert. denied, 498 U. S. 1122 (1991).

[4] "The late 1920s and early 1930s brought . . . a growing perception of crime both as a major problem and as a national one. . . . [C]riminal gangs found the submachinegun (a fully automatic, shoulder-fired weapon utilizing automatic pistol cartridges) and sawed-off shotgun deadly for close-range fighting." Hardy, The Firearms Owners' Protection Act: A Historical and Legal Perspective, 17 Cumb. L. Rev. 585, 590 (1987).

[5] The Senate Report on the bill explained: "The gangster as a law violator must be deprived of his most dangerous weapon, the machinegun. Your committee is of the opinion that limiting the bill to the taxing of sawed-off guns and machineguns is sufficient at this time. It is not thought necessary to go so far as to include pistols and revolvers and sporting arms. But while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction,

Congress therefore could reasonably presume that a person found in possession of an unregistered machinegun or sawed-off shotgun intended to use it for criminal purposes. The statute as a whole, and particularly the decision to criminalize mere possession, reflected a legislative judgment that the likelihood of innocent possession of such an unregistered weapon was remote, and far less significant than the interest in depriving gangsters of their use.

In addition, at the time of enactment, this Court had already construed comparable provisions of the Harrison Anti-Narcotic Act not to require proof of knowledge of all the facts that constitute the proscribed offense. *United States* v. *Balint,* 258 U. S. 250 (1922).[6] Indeed, Attorney General Cummings expressly advised Congress that the text of the gun control legislation deliberately followed the language of the Anti-Narcotic Act to reap the benefit of cases construing it.[7] Given the reasoning of *Balint,* we properly may infer that Congress did not intend the Court to read a stricter knowledge requirement into the gun control legislation than we read into the Anti-Narcotic Act. *Cannon* v. *University of Chicago,* 441 U. S. 677, 698–699 (1979).

Like the 1934 Act, the current National Firearms Act is primarily a regulatory measure. The statute establishes

---

there is no reason why anyone except a law officer should have a machinegun or sawed-off shotgun." S. Rep. No. 1444, 73d Cong., 2d Sess., 1–2 (1934).

[6] In the *Balint* case, after acknowledging the general common-law rule that made knowledge of the facts an element of every crime, we held that as to statutory crimes the question is one of legislative intent, and that the Anti-Narcotic Act should be construed to authorize "punishment of a person for an act in violation of law[,] [even] when ignorant of the facts making it so." *Balint,* 258 U. S., at 251–252. The "policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the noxious character of what he sells." *Id.,* at 253.

[7] See National Firearms Act: Hearings on H. R. 9066 before the House Committee on Ways and Means, 73d Cong., 2d Sess., 6 (1934).

taxation, registration, reporting, and recordkeeping require-
ments for businesses and transactions involving statutorily
defined firearms, and requires that each firearm be identified
by a serial number. 26 U. S. C. §§ 5801–5802, 5811–5812,
5821–5822, 5842–5843. The Secretary of the Treasury must
maintain a central registry that includes the names and ad-
dresses of persons in possession of all firearms not controlled
by the Government. § 5841. Congress also prohibited cer-
tain acts and omissions, including the possession of an unreg-
istered firearm.[8] § 5861.

As the Court acknowledges, *ante*, at 607, to interpret
statutory offenses such as § 5861(d), we look to "the nature
of the statute and the particular character of the items reg-
ulated" to determine the level of knowledge required for
conviction. An examination of § 5861(d) in light of our prec-
edent dictates that the crime of possession of an unregis-
tered machinegun is in a category of offenses described as
"public welfare" crimes.[9] Our decisions interpreting such
offenses clearly require affirmance of petitioner's conviction.

## II

"Public welfare" offenses share certain characteristics: (1)
they regulate "dangerous or deleterious devices or products

---

[8] "Omission of a mental element is the norm for statutes designed to deal
with inaction. *Not* registering your gun, *not* cleaning up your warehouse,
*United States* v. *Park*, 421 U. S. 658 . . . (1975), and like 'acts' are done
without thinking. Often the omission occurs because of lack of atten-
tion. . . . Yet Congress may have sound reasons for requiring people to
investigate and act, objectives that cannot be achieved if the courts add
mental elements to the statutes." *Ross*, 917 F. 2d, at 1000.

[9] These statutes are sometimes referred to as "strict liability" offenses.
As the Court notes, because the defendant must know that he is engaged
in the type of dangerous conduct that is likely to be regulated, the use of
the term "strict liability" to describe these offenses is inaccurate. *Ante*,
at 607–608, n. 3. I therefore use the term "public welfare offense" to de-
scribe this type of statute.

or obnoxious waste materials," see *United States* v. *International Minerals & Chemical Corp.*, 402 U. S. 558, 565 (1971); (2) they "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare," *Morissette*, 342 U. S., at 254; and (3) they "depend on no mental element but consist only of forbidden acts or omissions," *id.*, at 252–253. Examples of such offenses include Congress' exertion of its power to keep dangerous narcotics,[10] hazardous substances,[11] and impure and adulterated foods and drugs[12] out of the channels of commerce.[13]

Public welfare statutes render criminal "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." *Liparota* v. *United States*, 471 U. S. 419, 433 (1985). Thus, under such statutes, "a defendant can be convicted even though he was unaware of the circumstances of his conduct that made it illegal." *Id.*, at 443, n. 7 (White, J., dissenting). Referring to the strict criminal sanctions for unintended violations of the food and drug laws, Justice Frankfurter wrote:

> "The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should in-

---

[10] See *United States* v. *Balint*, 258 U. S. 250 (1922).

[11] See *United States* v. *International Minerals & Chemical Corp.*, 402 U. S. 558 (1971).

[12] See *United States* v. *Dotterweich*, 320 U. S. 277 (1943).

[13] The Court in *Morissette* v. *United States*, 342 U. S. 246 (1952), expressing approval of our public welfare offense cases, stated:

"Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static." *Id.*, at 260 (footnotes omitted).

fuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. The prosecution . . . is based on a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." *United States* v. *Dotterweich,* 320 U. S. 277, 280–281 (1943) (citing *United States* v. *Balint,* 258 U. S. 250 (1922); other citations omitted).

The National Firearms Act unquestionably is a public welfare statute. *United States* v. *Freed,* 401 U. S. 601, 609 (1971) (holding that this statute "is a regulatory measure in the interest of the public safety"). Congress fashioned a legislative scheme to regulate the commerce and possession of certain types of dangerous devices, including specific kinds of weapons, to protect the health and welfare of the citizenry. To enforce this scheme, Congress created criminal penalties for certain acts and omissions. The text of some of these offenses—including the one at issue here—contains no knowledge requirement.

The Court recognizes:

"[W]e have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him 'in responsible relation to a public danger,' *Dotterweich, supra,* at 281, he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to 'ascertain at his peril whether [his conduct] comes within the inhibition of the statute.' *Balint,* 258 U. S., at 254." *Ante,* at 607.

We thus have read a knowledge requirement into public welfare crimes, but not a requirement that the defendant know all the facts that make his conduct illegal. Although the Court acknowledges this standard, it nevertheless concludes that a gun is not the type of dangerous device that would alert one to the possibility of regulation.

Both the Court and JUSTICE GINSBURG erroneously rely upon the "tradition[al]" innocence of gun ownership to find that Congress must have intended the Government to prove knowledge of all the characteristics that make a weapon a statutory "firear[m]." *Ante*, at 610–612; *ante*, at 621–622 (GINSBURG, J., concurring in judgment). We held in *Freed*, however, that a § 5861(d) offense may be committed by one with no awareness of either wrongdoing or of all the facts that constitute the offense.[14] 401 U. S., at 607–610. Nevertheless, the Court, asserting that the Government "gloss[es] over the distinction between grenades and guns," determines that "the gap between *Freed* and this case is too wide to bridge." *Ante*, at 610. As such, the Court instead reaches the rather surprising conclusion that guns are more analogous to food stamps than to hand grenades.[15] Even if

---

[14] *Freed*, 401 U. S., at 607 (holding that a violation of § 5861(d) may be established without proof that the defendant was aware of the fact that the firearm he possessed was unregistered). Our holding in *Freed* is thus squarely at odds with the Court's conclusion that the "defendant must know the facts that make his conduct illegal," *ante*, at 619.

[15] The Court's and JUSTICE GINSBURG's reliance upon *Liparota* v. *United States*, 471 U. S. 419 (1985), is misplaced. *Ante*, at 610–612; *ante*, at 621–622. Although the Court is usually concerned with fine nuances of statutory text, its discussion of *Liparota* simply ignores the fact that the food stamp fraud provision, unlike § 5861(d), contained the word "knowingly." The Members of the Court in *Liparota* disagreed on the proper interpretation. The dissenters accepted the Government's view that the term merely required proof that the defendant had knowledge of the facts that constituted the crime. See *Liparota*, 471 U. S., at 442–443 (White, J., dissenting) ("I would read § 2024(b)(1) . . . to require awareness of only the relevant aspects of one's conduct rendering it illegal, not the

one accepts that dubious proposition, the Court founds it upon a faulty premise: its mischaracterization of the Government's submission as one contending that *"all guns . . .* are dangerous devices that put gun owners on notice *. . . ." Ante,* at 608 (emphasis added).[16] Accurately identified, the Government's position presents the question whether guns such as the one possessed by petitioner " 'are highly dangerous offensive weapons, no less dangerous than the narcotics' " in *Balint* or the hand grenades in *Freed,* see *ante,* at 609 (quoting *Freed,* 401 U. S., at 609).[17]

---

fact of illegality"). The majority, however, concluded that "knowingly" also connoted knowledge of illegality. *Id.,* at 424–425. Because neither "knowingly" nor any comparable term appears in § 5861(d), the statute before us today requires even less proof of knowledge than the dissenters would have demanded in *Liparota.*

[16] JUSTICE GINSBURG similarly assumes that the character of *"all guns"* cannot be said to place upon defendants an obligation "to inquire about the need for registration." *Ante,* at 622 (emphasis added).

[17] The Government does note that some Courts of Appeals have required proof of knowledge only that "the weapon was 'a firearm, within the general meaning of that term,'" Brief for United States 24–25 (citing cases). Contrary to the assertion by the Court, *ante,* at 632, n. 5, however, the Government does not advance this test as the appropriate knowledge requirement, but instead supports the one used by other Courts of Appeals. Compare the Court's description of the Government's position, *ibid.,* with the following statements in the Government's brief:

"A defendant may be convicted of such offenses so long as the government proves that he knew the item at issue was highly dangerous and of a type likely to be subject to regulation." Brief for United States 9.

"[T]he court of appeals correctly required the government to prove only that petitioner knew that he possessed a dangerous weapon likely to be subject to regulation." *Id.,* at 13.

"B. The intent requirement applicable to Section 5861(d) is knowledge that one is dealing with a dangerous item of a type likely to be subject to regulation." *Id.,* at 16.

"But where a criminal statute involves regulation of a highly hazardous substance—and especially where it penalizes a failure to act or to comply with a registration scheme—the defendant's knowledge that he was deal-

Thus, even assuming that the Court is correct that the mere possession of an ordinary rifle or pistol does not entail sufficient danger to alert one to the possibility of regulation, that conclusion does not resolve this case. Petitioner knowingly possessed a semiautomatic weapon that was readily convertible into a machinegun. The "'character and nature'" of such a weapon is sufficiently hazardous to place the possessor on notice of the possibility of regulation. See *Posters 'N' Things, Ltd.* v. *United States, ante,* at 525 (citation omitted).[18] No significant difference exists between

---

ing with such a substance and that it was likely to be subject to regulation provides sufficient intent to support a conviction." *Id.,* at 17–18.

"Rather, absent contrary congressional direction, knowledge of the highly dangerous nature of the articles involved and the likelihood that they are subject to regulation takes the place of the more rigorous knowledge requirement applicable where apparently innocent and harmless devices are subject to regulation." *Id.,* at 20.

"But the instruction did not require the government to prove that petitioner knew his weapon 'possess[ed] every last characteristic [which subjects it] to regulation'; he need only have 'know[n] that he [was] dealing with a dangerous device of a type as would alert one to the likelihood of regulation.' Tr. 465.

"That instruction accurately describes the mental state necessary for a violation of Section 5861(d)." *Id.,* at 23.

"[P]roof that a defendant was on fair notice that the item he possessed was highly dangerous and likely to be regulated is sufficient to support a conviction." *Id.,* at 24.

[18] The Court and JUSTICE GINSBURG apparently assume that the outer limits of any such notice can be no broader than the category of dangerous objects that Congress delineated as "firearms." *Ante,* at 611–612; *ante,* at 621–622. Our holding in *Posters 'N' Things,* illustrates the error in that assumption. A retailer who may not know whether certain merchandise is actually drug paraphernalia, as that term is defined in the relevant federal statute, may nevertheless violate the law if "aware that customers in general are likely to use the merchandise with drugs." *Ante,* at 524. The owner of a semiautomatic weapon that is readily convertible into a machinegun can certainly be aware of its dangerous nature and the consequent probability of regulation even if he does not know whether the

imposing upon the possessor a duty to determine whether such a weapon is registered, *Freed,* 401 U. S., at 607–610, and imposing a duty to determine whether that weapon has been converted into a machinegun.

Cases arise, of course, in which a defendant would not know that a device was dangerous unless he knew that it was a "firearm" as defined in the Act. *Freed* was such a case; unless the defendant knew that the device in question was a hand grenade, he would not necessarily have known that it was dangerous. But given the text and nature of the statute, it would be utterly implausible to suggest that Congress intended the owner of a sawed-off shotgun to be criminally liable if he knew its barrel was 17.5 inches long but not if he mistakenly believed the same gun had an 18-inch barrel. Yet the Court's holding today assumes that Congress intended that bizarre result.

The enforcement of public welfare offenses always entails some possibility of injustice. Congress nevertheless has repeatedly decided that an overriding public interest in health or safety may outweigh that risk when a person is dealing with products that are sufficiently dangerous or deleterious to make it reasonable to presume that he either knows, or should know, whether those products conform to special regulatory requirements. The dangerous character of the product is reasonably presumed to provide sufficient notice of the probability of regulation to justify strict enforcement against those who are merely guilty of negligent, rather than willful, misconduct.

The National Firearms Act is within the category of public welfare statutes enacted by Congress to regulate highly dangerous items. The Government submits that a conviction under such a statute may be supported by proof that the

weapon is actually a machinegun. If ignorance of the precise characteristics that render an item forbidden should be a defense, items that are likely to be "drug paraphernalia" are no more obviously dangerous, and thus regulated, than items that are likely to be "firearms."

defendant "knew the item at issue was highly dangerous and of a type likely to be subject to regulation." Brief for United States 9.[19] It is undisputed that the evidence in this case met that standard. Nevertheless, neither JUSTICE THOMAS for the Court nor JUSTICE GINSBURG has explained why such a knowledge requirement is unfaithful to our cases or to the text of the Act.[20] Instead, following the approach of their decision in *United States* v. *Harris*, 959 F. 2d 246, 260–261 (CADC) *(per curiam)*, cert. denied *sub nom. Smith* v. *United States*, 506 U. S. 932 (1992), they have simply explained why, in their judgment, it would be unfair to punish the possessor of this machinegun.

## III

The history and interpretation of the National Firearms Act supports the conclusion that Congress did not intend to

---

[19] As a matter of law, this is the level of knowledge required by the statute. Therefore, contrary to the Court's suggestion, *ante*, at 612, n. 6, I have not left the determination of the "exact content of the knowledge requirement" to the jury. I only leave to the jury its usual function: the application of this legal standard to the facts. In performing this function, juries are frequently required to determine if a law has been violated by application of just such a "general 'standard.'" See, *e. g.*, *Posters 'N' Things*, *ante*, at 523–525; *Miller* v. *California*, 413 U. S. 15, 24 (1973).

[20] The Court also supports its conclusion on the basis of the purported disparity between the penalty provided by this statute and those of other regulatory offenses. Although a modest penalty may indicate that a crime is a public welfare offense, such a penalty is not a requisite characteristic of public welfare offenses. For example, the crime involved in *Balint* involved punishment of up to five years' imprisonment. See *Dotterweich*, 320 U. S., at 285; see also *Morissette*, 342 U. S., at 251, n. 8 (noting that rape of one too young to consent is an offense "in which the victim's actual age was determinative despite defendant's reasonable belief that the girl had reached age of consent"). Moreover, congressional authorization of a range of penalties in some cases—petitioner, for instance, is on probation—demonstrates a recognition that relatively innocent conduct should be punished less severely.

require knowledge of all the facts that constitute the offense of possession of an unregistered weapon. During the first 30 years of enforcement of the 1934 Act, consistent with the absence of a knowledge requirement and with the reasoning in *Balint*, courts uniformly construed it not to require knowledge of all the characteristics of the weapon that brought it within the statute. In a case decided in 1963, then-Judge Blackmun reviewed the earlier cases and concluded that the defendant's knowledge that he possessed a gun was "all the scienter which the statute requires." *Sipes* v. *United States*, 321 F. 2d 174, 179 (CA8), cert. denied, 375 U. S. 913 (1963).

Congress subsequently amended the statute twice, once in 1968 and again in 1986. Both amendments added knowledge requirements to other portions of the Act,[21] but neither the text nor the history of either amendment discloses an intent to add any other knowledge requirement to the possession of an unregistered firearm offense. Given that, with only one partial exception,[22] every federal tribunal to address the question had concluded that proof of knowledge of all the facts constituting a violation was not required for a convic-

---

[21] Significantly, in 1968, Congress included a knowledge requirement in § 5861(*l*). 26 U. S. C. § 5861(*l*) (making it unlawful "to make, or cause the making of, a false entry on any application, return, or record required by this chapter, *knowing* such entry to be false") (emphasis added). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez* v. *United States*, 480 U. S. 522, 525 (1987) (internal quotation marks and citations omitted); see also *Lawrence County* v. *Lead-Deadwood School Dist. No. 40–1*, 469 U. S. 256, 267–268 (1985).

[22] *United States* v. *Herbert*, 698 F. 2d 981, 986–987 (CA9), cert. denied, 464 U. S. 821 (1983) (requiring the Government to prove knowledge of all the characteristics of a weapon only when no *external* signs indicated that the weapon was a "firearm"). Not until 1989 did a Court of Appeals adopt the view of the majority today. See *United States* v. *Williams*, 872 F. 2d 773 (CA6).

tion under § 5861(d),[23] we may infer that Congress intended that interpretation to survive. See *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978).

In short, petitioner's knowledge that he possessed an item that was sufficiently dangerous to alert him to the likelihood of regulation would have supported a conviction during the first half century of enforcement of this statute. Unless application of that standard to a particular case violates the Due Process Clause,[24] it is the responsibility of Congress, not this Court, to amend the statute if Congress deems it unfair or unduly strict.

## IV

On the premise that the purpose of the *mens rea* requirement is to avoid punishing people "for apparently innocent activity," JUSTICE GINSBURG concludes that proof of knowledge that a weapon is "'a dangerous device of a type as would alert one to the likelihood of regulation'" is not an adequate *mens rea* requirement, but that proof of knowledge that the weapon possesses "'every last characteristic'" that subjects it to regulation is. *Ante*, at 622–623, and n. 5 (GINSBURG, J., concurring in judgment) (quoting the trial court's jury instruction).

---

[23] See, *e. g.*, *United States* v. *Gonzalez*, 719 F. 2d 1516, 1522 (CA11 1983), cert. denied, 465 U. S. 1037 (1984); *Morgan* v. *United States*, 564 F. 2d 803, 805–806 (CA8 1977); *United States* v. *Cowper*, 503 F. 2d 130, 132–133 (CA6 1974), cert. denied, 420 U. S. 930 (1975); *United States* v. *DeBartolo*, 482 F. 2d 312, 316 (CA1 1973); *United States* v. *Vasquez*, 476 F. 2d 730, 732 (CA5), cert. denied, 414 U. S. 836 (1973), overruled by *United States* v. *Anderson*, 885 F. 2d 1248 (CA5 1989) (en banc).

And, as I have already noted, *United States* v. *Freed*, 401 U. S. 601 (1971), was consistent with the Government's position here. Although the Government accepted the burden of proving that Freed knew that the item he possessed was a hand grenade, the possessor of an unfamiliar object such as a hand grenade would not know that it was "a dangerous item of a type likely to be subject to regulation," Brief for United States 16; see also *id.*, at 20, 23, 24, unless he knew what it was.

[24] Petitioner makes no such claim in this Court.

Assuming that "innocent activity" describes conduct without any consciousness of wrongdoing, the risk of punishing such activity can be avoided only by reading into the statute the common-law concept of *mens rea:* "an evil purpose or mental culpability." *Morissette,* 342 U. S., at 252.[25] But even petitioner does not contend that the Government must prove guilty intent or intentional wrongdoing. Instead, the *"mens rea"* issue in this case is simply what knowledge requirement, if any, Congress implicitly included in this offense. There are at least five such possible knowledge requirements, four of which entail the risk that a completely innocent mistake will subject a defendant to punishment.

First, a defendant may know that he possesses a weapon with all of the characteristics that make it a "firearm" within the meaning of the statute and also know that it has never been registered, but be ignorant of the federal registration requirement. In such a case, we presume knowledge of the law even if we know the defendant is "innocent" in the sense that JUSTICE GINSBURG uses the word. Second, a defendant may know that he possesses a weapon with all of the characteristics of a statutory firearm and also know that the law requires that it be registered, but mistakenly believe that it is in fact registered. *Freed* squarely holds that this defendant's "innocence" is not a defense. Third, a defendant

---

[25] Our use of the term *mens rea* has not been consistent. In *Morissette,* we used the term as if it always connoted a form of wrongful intent. In other cases, we employ it simply to mean whatever level of knowledge is required for any particular crime. See, *e. g., United States* v. *Bailey,* 444 U. S. 394, 403 (1980). In this sense, every crime except a true strict-liability offense contains a *mens rea* requirement. For instance, the Court defined *mens rea* in *Liparota* v. *United States,* 471 U. S., at 426, as "knowledge of illegality." In dissent, however, Justice White equated the term with knowledge of the facts that make the conduct illegal. *Id.,* at 442–443. Today, the Court assigns the term the latter definition, *ante,* at 605, but in fact requires proof of knowledge of only some of the facts that constitute the violation, *ante,* at 609 (not requiring proof of knowledge of the fact that the gun is unregistered).

may know only that he possesses a weapon with all of the characteristics of a statutory firearm. Neither ignorance of the registration requirement nor ignorance of the fact that the weapon is unregistered protects this "innocent" defendant. Fourth, a defendant may know that he possesses a weapon that is sufficiently dangerous to likely be regulated, but not know that it has all the characteristics of a statutory firearm. Petitioner asserts that he is an example of this "innocent" defendant. Fifth, a defendant may know that he possesses an ordinary gun and, being aware of the widespread lawful gun ownership in the country, reasonably assume that there is no need "to inquire about the need for registration." *Ante,* at 622 (GINSBURG, J., concurring in judgment). That, of course, is not this case. See *supra,* at 624, and n. 1.[26]

JUSTICE GINSBURG treats the first, second, and third alternatives differently from the fourth and fifth. Her acceptance of knowledge of the characteristics of a statutory "firearm" as a sufficient predicate for criminal liability—despite ignorance of either the duty to register or the fact of nonregistration, or both—must rest on the premise that such knowledge would alert the owner to the likelihood of regulation, thereby depriving the conduct of its "apparen[t] innocen[ce]." Yet in the fourth alternative, a jury determines just such knowledge: that the characteristics of the weapon known to the defendant would alert the owner to the likelihood of regulation.

In short, JUSTICE GINSBURG's reliance on "the purpose of the *mens rea* requirement—to shield people against punishment for apparently innocent activity," *ante,* at 622, neither explains why ignorance of certain facts is a defense although

---

[26] Although I disagree with the assumption that "widespread lawful gun ownership" provides a sufficient reason for believing that there is no need to register guns (there is also widespread lawful automobile ownership), acceptance of that assumption neither justifies the majority's holding nor contradicts my conclusion on the facts of this case.

ignorance of others is not, nor justifies her disagreement with the jury's finding that this defendant knew facts that should have caused him to inquire about the need for registration.[27]

## V

This case presents no dispute about the dangerous character of machineguns and sawed-off shotguns. Anyone in possession of such a weapon is "standing in responsible relation to a public danger." See *Dotterweich*, 320 U. S., at 281 (citation omitted). In the National Firearms Act, Congress determined that the serious threat to health and safety posed by the private ownership of such firearms warranted the imposition of a duty on the owners of dangerous weapons to determine whether their possession is lawful. Semiautomatic weapons that are readily convertible into machineguns are sufficiently dangerous to alert persons who knowingly possess them to the probability of stringent public regulation. The jury's finding that petitioner knowingly possessed "a dangerous device of a type as would alert one to the likelihood of regulation" adequately supports the conviction.

Accordingly, I would affirm the judgment of the Court of Appeals.

---

[27] In addition, contrary to JUSTICE GINSBURG's assumption, if one reads the term "firearm" from the quoted section of the indictment to mean "gun," the indictment still charges an offense under § 5861(d) and does not differ from the critical jury instruction. See *ante*, at 622–623. Even if JUSTICE GINSBURG is correct that there is a technical variance, petitioner makes no claim that any such variance prejudiced him. The wording of the indictment, of course, sheds no light on the proper interpretation of the underlying statutory text. Although the repeated use of a term in a *statute* may shed light on the statute's construction, see *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994), such use in an indictment is irrelevant to that question.