**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Terrence GALLAGHER, Appellant**

Superior Court of Pennsylvania.

Argued May 6, 2004.

Filed March 30, 2005.

Daniel H. Glammer, Norristown, for appellant.

Kevin J. McCloskey, Assistant District Attorney Norristown, for Commonwealth, appellee.

Before: STEVENS, BENDER and MONTEMURO,* JJ.

OPINION BY MONTEMURO, J.:

¶ 1 This is an appeal from the judgment of sentence entered April 23, 2003, in the Montgomery County Court of Common Pleas following Appellant's conviction of, *inter alia*, luring a child into a motor vehicle, 18 Pa.C.S.A. § 2910. For the reasons set forth below, we are compelled to vacate Appellant's luring conviction.

¶ 2 At approximately 11:40 p.m. on the evening of August 3, 2002, seventeen year old Michael Neal was walking back to his family's home in Hatfield, Montgomery County, after making a trip to a nearby 7 Eleven convenience store, when Appellant stopped his car and asked for directions to a gas station. After Neal directed him to two nearby stations, Appellant asked Neal where he was going. When Neal replied that he was on his way home, Appellant offered him a ride.[1] Neal agreed, got in the car, and Appellant turned around to head toward Neal's home. Before reaching there, however, Appellant asked Neal if he liked to drink, which they both understood to mean alcohol. Neal replied that he did, and Appellant drove to a local bar.

While Neal remained in the car, Appellant went inside the bar and purchased two 40–ounce bottles of beer.

¶ 3 Appellant drove around for a short time trying to find a place to drink, and then suggested that they go to his parked R.V. Neal agreed, accompanied Appellant into the R.V., and the two began drinking. A short time later, Appellant suggested they purchase more beer before he got too drunk to drive. Neal again waited in the car while Appellant went inside another bar to purchase more beer. After Appellant returned to the car, three women approached Neal, who was sitting in the passenger seat, and asked him his age, to which he replied "seventeen." (N.T., 1/21/03, at 23). The women left, and Appellant and Neal drove back to the R.V. On the way, Appellant told Neal "that [he] had ruined the night because [he] told [the girls] that [he] was seventeen." (*Id.* at 25). Back in the R.V., Appellant and Neal resumed drinking, and made one more trip to another bar for more beer. After they returned to the R.V. the third time, Appellant performed oral sex on Neal. Neal then told Appellant that he wanted to go home. However, Appellant, who was too drunk to drive, told Neal he would have to wait until morning. Neal eventually fell asleep. The next morning Appellant performed oral sex on him once again, and then drove Neal home, dropping him off a short distance from his house. Later that morning, after talking with his girlfriend's mother, Neal reported the incident to the police.

¶ 4 Appellant was originally charged with false imprisonment, rape, interference with the custody of a child, luring a child into a motor vehicle, corruption of minors, and furnishing malt or brewed beverages to minors, however, the rape and interfer-

---

* Retired Justice assigned to Superior Court.

1. Neal testified that the walk from the 7 Eleven to his house was approximately 400 feet. (N.T., 1/21/03, at 44).

ence with the custody of a child charges were withdrawn prior to trial. Following a one day bench trial, Appellant was convicted of luring a child into a motor vehicle and furnishing malt or brewed beverages to minors;[2] he was acquitted of the other charges. On April 23, 2003, he was sentenced to 2 to 4 years' imprisonment on the luring charge, followed by one year probation for the furnishing alcohol charge. This timely appeal follows.

¶ 5 Appellant's two interrelated issues, which in effect constitute one claim, focus solely on his conviction of luring a child into a motor vehicle. He argues first, that the trial court erred in imposing strict liability for the crime, and second, that the evidence supporting this conviction was insufficient. Although inartfully drafted, Appellant's argument focuses on the *mens rea* required with respect to the complainant's age. Here, the trial court acquitted Appellant of corruption of minors based specifically on Appellant's defense that he reasonably believed the complainant to be over the age of 18. *See* N.T., 1/22/03, at 236. He contends that this factual finding precludes his conviction for luring a child into a motor vehicle, in that the Commonwealth failed to prove that he possessed the sufficient *mens rea* to lure a person under the age of 18 into his car. We agree.

 ¶ 6 When reviewing a challenge to the sufficiency of the evidence,

we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all the elements of the offense beyond a reasonable doubt. It is the function of the fact-finder to pass upon the credibility of the witnesses and to determine the

weight to be accorded the evidence produced at trial. The fact-finder is free to believe all, part, or none of the evidence introduced.

*Commonwealth v. Adamo*, 431 Pa.Super. 529, 637 A.2d 302, 304 (1994), *appeal denied*, 538 Pa. 631, 647 A.2d 507 (1994), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994) (citations and quotations omitted).

¶ 7 The crime of luring a child into a motor vehicle is succinctly defined in 18 Pa.C.S.A. § 2910 as follows:

A person who lures a child into a motor vehicle without the consent, express or implied, of the child's parent or guardian, unless the circumstances reasonably indicate that the child is in need of assistance, commits a misdemeanor of the first degree.

Found in the Kidnapping Chapter of the Crimes Code, this crime has been described as "a threshold prophylactic rule for the terrible crime of kidnapping[.]" *Commonwealth v. Figueroa*, 436 Pa.Super. 569, 648 A.2d 555, 558 (1994), *appeal denied*, 436 Pa.Super. 569, 648 A.2d 555 (1994). However, its broad language leaves open its application to persons other than purported pedophiles.

¶ 8 Most of the reported cases interpreting this statute have focused on the meaning of the terms "lure" or "child," neither of which is defined in the statute. *See Commonwealth v. Nanorta*, 742 A.2d 176, 177 (Pa.Super.1999), *appeal denied*, 563 Pa. 613, 757 A.2d 930 (2000) (lure encompasses "inducement of any kind," including threats); *Figueroa*, *supra* at 557 (lure defined as "inducement to gain;" offer "of ride to school on a day when snow and ice made passage by foot difficult, could be welcomed as a favorable enticement by the pedestrian children."); *Adamo*, *supra* at

2. 18 Pa.C.S.A. § 6310.1.

307 (child defined as person under 18 years of age when read in *pari materia* with other sections of Kidnapping Chapter). What has not been clearly decided is the *mens rea*, if any, required for the crime with respect to the complainant's age.

¶ 9 Relying on *Figueroa, supra,* the trial court labeled this a "strict liability offense." (Trial Ct. Op. at 5). Further, the court concluded that the absence of any mistake of age provision in the statute precludes application of one in the present case. *See Id.* at 8–9. We find, however, that the trial court has misinterpreted the statute.

¶ 10 18 Pa.C.S.A § 302(c) clearly mandates that "[w]hen the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto." In *Figueroa,* this Court imputed the culpability requirements of § 302 to the luring element of the crime. Specifically, we held that

> [t]he gravamen of the present crime is luring a child into a motor vehicle. We have stated above that inviting the children into his car with a promise of a ride to school or the bus stop, which appellant here agrees he did, is sufficient to meet the prohibitions of the statute. This knowing conduct we believe meets the requirements of culpability. 18 Pa. C.S.A. § 302(b)(2). That there may have been no intent to harm is not rele-

vant since this is not a requirement of the act.

*Figueroa, supra* at 557–58. Thus, contrary to the trial court's interpretation, the *Figueroa* Court found strict liability in the luring statute only with respect to an intent to harm; the Court applied the culpability requirements of § 302 to the luring element of the crime. We find that these same culpability requirements must also be imputed to the age element.[3]

¶ 11 Although this issue has never been squarely addressed before, in all of the reported cases to date, save one which we shall discuss *infra,* the complainant has been a minor under the age of 15. *See Commonwealth v. Tate,* 572 Pa. 411, 816 A.2d 1097 (2003) (14 year old complainant); *Nanorta, supra* (10 year old complainant); *Figueroa, supra* (11 and 7 year old complainants); *Commonwealth v. McClintock,* 433 Pa.Super. 83, 639 A.2d 1222 (1994) (12 year old complainants). Unquestionably, the defendant in each of those cases clearly recognized that his victim was a child. In *Adamo, supra,* the only case in which a defense of reasonable mistake of age could be made (the complainant was one month shy of 17), the defendant stated to the complainant, "you can tell anybody I'm . . . I'll get in trouble. You're a minor." *Id.* at 306 (citation omitted). Therefore, the defendant clearly met the "knowing" requirement of the statute.

¶ 12 Moreover, most of the statutes intended to protect minor victims, even those dealing with sex crimes, provide some defense based on the actor's reason-

---

3. We note that "[a] criminal statute that imposes absolute liability typically involves regulation of traffic or liquor laws." *Commonwealth v. Pond,* 846 A.2d 699, 706 (Pa.Super.2004) (quotation omitted). When a statute does not explicitly impose strict liability, we must examine "the severity of the punishment imposed by the statute, the effect of such punishment on the defendant's reputation, and the common law origin of the crime involved" to determine whether strict liability was intended. *In Re B.A.M.,* 806 A.2d 893, 895 (Pa.Super.2002). Here, Appellant's sentence of 2 to 4 years' imprisonment and the obvious stigma attached to a conviction of luring a child into a car clearly indicate that strict liability was not intended.

able belief that the victim is older than those protected by the statute. *See* 18 Pa.C.S.A. § 3102 (providing defense of reasonable mistake of age of victim with regard to sex crimes committed against victim "below a critical age older than 14 years"); *Id.* at § 6301(d)(2) (providing defense of reasonable mistake of age to corruption of minors charge when actual age of minor is over 16). *But See* 18 Pa.C.S.A. § 6312(e.1) (explicitly providing no mistake of age defense to a person who either photographs, videotapes or films child under 18 engaging in prohibited sexual act or simulation thereof, or causes or permits child to engage in such acts). As the trial court noted, the statute *sub judice* does not specifically provide a mistake of age defense. However, that omission does not absolve the Commonwealth of its burden to prove that Appellant possessed the requisite *mens rea* to commit the crime.

¶ 13 Applying § 302, we hold that the Commonwealth was required to prove, beyond a reasonable doubt, that Appellant either intentionally sought out the complainant because he was under the age of 18, knew the complainant was under the age of 18, or, at the very least, was reckless as to the complainant's age. Although the trial court states in its Opinion that "[t]he evidence, in no uncertain terms, clearly establishes that [Appellant] was fully aware of the fact that his young companion was a minor," (Trial Ct. Op. at 7), this finding is contradicted by the Appellant's acquittal on the charge of corruption of minors based on his testimony that he reasonably believed Neal to be over the age of 18. Indeed, a photograph of the victim at the time of the incident included among the trial exhibits makes evident why the trial judge would credit Appellant's mistake of age defense. This credibility determination makes ludicrous the court's subsequent finding that Appellant

"knew he was dealing with a minor." (*Id.*). Moreover, the fact that Appellant may have learned later in the evening that Neal was only 17 years old is irrelevant. By that time, Neal had already entered Appellant's R.V. with him and begun drinking.

¶ 14 Accordingly, we find that the Commonwealth has failed to satisfy its burden of proving beyond a reasonable doubt that Appellant either knew the complainant was under the age of 18, or, at the very least, was reckless as to his age when he offered Neal a ride home. Therefore, we reverse the judgment of sentence on the luring conviction.

¶ 15 Judgment of sentence reversed in part. Jurisdiction relinquished.

¶ 16 BENDER, J. files a Concurring Opinion.

¶ 17 STEVENS, J. files a Dissenting Opinion.

BENDER J., Concurring.:

¶ 1 I am in agreement with the position set forth in the Lead Opinion drafted by my colleague, Justice Montemuro, and therefore join in that Opinion. However, I write separately to supplement the discussion with respect to the basis relied upon in the Lead Opinion, and also to discuss a second basis for reversing the conviction on luring a child into a motor vehicle and to add some commentary with respect to the offense in question.

¶ 2 I agree with the lead Opinion that, as § 2910 does not expressly include a *mens rea* requirement, we must look to 18 Pa. C.S. § 302(c) to define the culpability requirements. In fact, I believe the decision in *Commonwealth v. Mayfield,* 574 Pa. 460, 832 A.2d 418 (2003), compels us to do so. In *Mayfield,* our Supreme Court reversed the trial court's conclusion that the institutional sexual assault statute, 18 Pa. C.S. § 3124.2, was unconstitutional. The

trial court had noted that the statute, as written, did not contain a *mens rea* requirement and, thus, the trial court concluded that the statute must be viewed as imposing strict liability. The trial court then further noted that because of the lack of a *mens rea* requirement, a correctional officer could violate the statute if he/she had consensual sex with an inmate while being unaware that the person was an inmate. The trial court, relying upon *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), then concluded that the imposition of strict liability in this context violated due process.

¶ 3 Our Supreme Court disagreed with the trial court's thesis that the lack of a *mens rea* requirement indicated that the offense must be construed as a strict liability offense stating:

> The trial court's foray into a *Staples* analysis was unnecessary because evidence of the General Assembly's intent as to the *mens rea* of § 3124.2 is clear. Although the statute is silent as to *mens rea*, 18 Pa.C.S. § 302 provides for such situations: "CULPABILITY REQUIRED UNLESS OTHERWISE PROVIDED.—When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto." 18 Pa.C.S. § 302(c).

*Mayfield*, 832 A.2d at 427. Thus, according to the Supreme Court:

> Once the trial court determined the General Assembly did not intend § 3124.2 to be a strict liability crime, it need have done nothing more than advert to § 302(c) and require the Commonwealth to prove at least recklessness. Thus, to be convicted under § 3124.2, a corrections officer would have to be at least reckless as to the

status of their sexual partner as an "inmate, detainee, patient or resident." 18 Pa.C.S. § 3124.2(a). Had the trial court done this, its concern—which pervades its opinion—about the conviction of hapless corrections officers for having consensual sex with persons who unbeknown to them are inmates, would be alleviated.

*Id.* Given this analysis, I believe that absent a plain legislative intent to impose strict liability, the culpability requirements of § 302 must be imputed to a criminal offense.

¶ 4 A review of *Mayfield* demonstrates how imputation of a culpability requirement transforms the *mens rea* analysis and drastically alters the conclusion that criminal liability attaches under the facts of the present case. In *Mayfield*, the Court addressed the hypothetical possibility that a corrections officer could be found criminally liable for having consensual sex with a person who the corrections officer was not aware was an inmate. According to the Supreme Court, since the statute was silent as to a *mens rea* requirement for this particular element of the offense, application of § 302 would require that it be shown that the corrections officer either knew the sexual partner was an inmate or was at least reckless as to the status of the sexual partner.

¶ 5 Applying the *Mayfield* analysis to this case indicates that it was error not to consider a reasonable mistake as to age. Under § 2910 the age of the person "lured" into a motor vehicle is an element of the offense, that is, it is only illegal to lure a child into a motor vehicle, and the statute does not provide a *mens rea* requirement as to this element. A person's age, like the fact that person is an inmate, is a status. Thus, application of *Mayfield* indicates that the statute should have been construed to require that an actor either

know that the person he is luring into the vehicle is a child or be reckless as to the status of that person as a minor. Of course, as the court concluded that Appellant reasonably believed the complainant was eighteen years of age or older, the court should have also acquitted Appellant of luring a child into a motor vehicle.

¶ 6 Turning generally to the offense of luring a child into a motor vehicle, I feel compelled to write separately to express my concerns regarding the present drafting of this offense. In my opinion, while the legislation in question may be well intended, the section is not judiciously drafted,[4] and therefore represents "bad law" which criminalizes a great deal of seemingly innocent human behavior.

¶ 7 In *Commonwealth v. Figueroa,* 436 Pa.Super. 569, 648 A.2d 555, 558 (1994), we concluded that the offense of luring a child into a motor vehicle constituted a "threshold prophylactic rule for the terrible crime of kidnapping," a logical conclusion it would seem given that the offense is situated in the Chapter of the Crimes Code dealing with, and entitled, "kidnapping." In a similar vein, while discussing the statutory prohibition, State Representative Kevin Blaum, who had served as the Democratic Chairman of the House Judiciary Committee, recently stated "attempted child abductions are serious crimes."[5] Viewed in this posture, the offense, although briefly defined and rather broadly worded, seems benign enough and thoroughly well-intentioned. Indeed, had the judiciary followed the legal maxim that penal statutes should be strictly construed, it could pass as sound legislation addressing a universally agreed upon evil. Unfortunately, in the admittedly sparse number of reported appellate decisions, the interpretation of the statute has been as broad as its wording.

¶ 8 For instance, the term "lure" seemingly connotes the deliberate enticement for improper purposes, perhaps capture,[6] and if the offense is deemed a precursor to kidnapping or designed to address child abductions, then a judicial interpretation that one must have some ill intent to be guilty of the offense would seem only logical. However, judicial interpretation by this Court of the term "lure" has been possibly broader than the terms of the

---

**4.** In the first instance, the imprecision of the statutory language is apparent when the act's language is closely examined. The statute reads: "a person who *lures a child into a* motor vehicle without the consent, express or implied, of the child's parent or guardian...." 18 Pa.C.S. § 2910. Thus, literally read, the statute prohibits an individual from luring of a child into a motor vehicle without the express or implied consent of the child's parent or guardian. This phraseology begs the question, what parent or guardian gives another person their consent to have their child "lured" into a motor vehicle? If another person has been given express permission to drive another's child somewhere, ordinarily the child will not need to be "lured" into the motor vehicle as that term is normally understood. Imagine Mrs. Smith telling Mrs. Jones "Sure, you can bring Jimmy home from soccer practice, but he's a stubborn sort. So, I hereby give you my permission to offer Jimmy a candy bar to get him into the car." Undoubtedly, the statute was meant to read "a person who lures a child into a car, where the person has neither the express nor implied consent from the child's parent or guardian to have that child in their car,... commits a misdemeanor of the first degree." In my opinion, the fact that the offense has such imprecise wording should be cause for alarm and foreshadows other potential pitfalls.

**5.** Brett Marcy, *"Luring" law hole rankles Rep. Blaum,* North Eastern Pennsylvania Times Leader, March 8, 2005, on-line ed.

**6.** The America Heritage Dictionary defines "lure" thusly, "something that tempts or attracts with the promise of pleasure or reward." The American Heritage Dictionary 503 (4th ed.2001).

statute and has not only successfully divorced a nefarious intent from the term, but has also expanded the word "lure" clearly beyond any ordinary conception of the term. While this interpretative approach to construing the statute might have been as well intentioned as the legislature's purpose in enacting the provision, the result has been the creation of a criminal provision that casts such a wide net that it theoretically makes criminals of many Pennsylvanians for conduct that does not strike the average citizen as criminal at all.

¶ 9 The first, and really only case dealing with the *mens rea* requirement of § 2910 was *Figueroa*. Addressing a claim that implicit in the statute was an intent to harm the child, we rejected the notion that the offense required a showing of intent to harm the child being lured. We stated:

> inviting the children into his car with a promise of a ride to school or the bus stop, which appellant here agrees that he did, is sufficient to meet the prohibitions of the statute. This knowing conduct we believe meets the requirement of culpability. 18 Pa.C.S.A. § 302(b)(2). That there may have been no intent to harm is not relevant since this is not a requirement of the act.

*Id.* 648 A.2d at 557–58. In so concluding, the panel seemingly endorsed the trial court's view that "the statute is a strict liability offense which may be breached by violation of its provisions regardless of motive." *Id.* at 557.

¶ 10 Despite the broad language used above, there was one passage from *Figueroa* that hinted at a restrained interpretation of the key term, as the panel went on to state "we conclude that it is a legitimate exercise of the legislature's discretion, to prohibit persons from offering rides to children under any invitational pretext." *Id.* at 558 (emphasis added). Precisely what the panel meant by the terminology "invitational pretext" is unclear, although the term invitational pretext would conceivably require a showing that the offer of a ride was simply a ruse to effectuate an ulterior motive, presumably a nefarious one. Nevertheless, it is notable that the panel did not contend that the evidence was sufficient to establish that the appellant's offer of a ride to school was not sincere. As such, as quickly as it appeared to interject a scienter element into the offense, the panel apparently negated it just as quickly.

¶ 11 Thus, whether or not the offense is technically a "strict liability" offense as suggested by the trial court in *Figueroa*, it appears that all that is necessary under *Figueroa*, from a *mens rea* perspective, is the actor's intent to secure a child's entry into a vehicle. While this holding hardly represents a restrained interpretation of the statute, judicial restraint has been perhaps more lacking with respect to interpretation of the term "lure."

¶ 12 In our first reported decision on this statute, *Commonwealth v. Adamo*, 431 Pa.Super. 529, 637 A.2d 302 (1994), we upheld the statute against a constitutional challenge of overbreadth. In so doing, we ostensibly indicated that a mere offer of a ride did not constitute a lure. In *Adamo*, the appellant argued that the statute was overbroad because it could be violated by an innocent offer of a ride and appellant proffered various hypothetical scenarios to illustrate his point. We disagreed, invoking the dictionary definition of that term, which defined "lure" as "to tempt by pleasure or gain," we reasoned that "these simple offers [the appellant's hypotheticals] do not involve a 'lure.'" *Id.* at 307.

¶ 13 Several years later, in *Commonwealth v. Nanorta*, 742 A.2d 176 (Pa.Super.1999), we reiterated the essence of the *Adamo* holding while expounding upon the

essence of the term "lure." Addressing *Adamo* and the claim that a mere offer of a ride could invoke criminal liability, we stated:

> This court rejected the claim because it presented only those situations wherein the car ride was the only offer. Such an offer, reasoned the *Adamo* court, does not include a "lure," that is, an offer to "tempt by pleasure or gain."

*Nanorta*, 742 A.2d at 177. The *Adamo* holding has not, however, stopped this Court from construing the term "lure" broadly when it has seen fit to affirm a conviction under the statute.

¶ 14 For instance, in *Figueroa*, the panel was confronted with a situation where the only inducement to the child to enter a motor vehicle was the offer of a ride to school on a day after a severe snowstorm. Despite the language in *Adamo* suggesting that the mere offer of a ride did not constitute luring under the statute, the *Figueroa* panel nevertheless concluded that the mere offer of a ride, at least when conditions were rather inclement, was a sufficient inducement to constitute a lure under the statute. Focusing upon the definitional phrase that a lure represents an "inducement to gain," the panel opined:

> So understood as an "inducement to gain" it is easy to see that the offer, as viewed by the offeror (whose conduct is under scrutiny), of a ride to school on a day when snow and ice made passage by foot difficult, could be welcomed as a favorable enticement by the pedestrian children.

*Figueroa*, 648 A.2d at 557.

¶ 15 The *Nanorta* panel faced its own dilemma in interpreting the term lure and was similarly resolute in finding a violation of the statute. In *Nanorta*, the appellant had not offered the child anything to enter his vehicle. Rather the appellant pulled his vehicle up beside a ten-year-old girl and stated, "get in my car." *Id.* at 177. Via expansive reading, if not tortured rationale, the trial court found the defendant's words to constitute a "lure" and the *Nanorta* panel concurred, adopting the reasoning of the trial court.[7]

¶ 16 Additionally, although lacking any significant discussion of the issue, a panel of this Court, in the case of *Commonwealth v. McClintock*, 433 Pa.Super. 83, 639 A.2d 1222 (1994), found the evidence sufficient to uphold a conviction for attempted luring where the appellant had done no more than wave or motion with his hand at the children in question in a manner as if to signal "come here." Since the panel did not set forth any definitions of the term "lure" in its analysis, we are without the benefit of the panel's rationale. However, one might presume that the rationale involved the concept that the act of waving to a child in a "come hither" manner was an act designed to gain the child's entrance to the vehicle and as such was a lure.

---

**7.** In finding the statement a "lure," the trial court ignored the fact that the appellant's statement was clearly a command, order or directive and that these terms were not included in the statutory definition of the crime. Rather, focusing upon the concept that a lure involves an offer to tempt by pleasure or gain, the trial court concluded that:

> there is no practical difference between a man who tells a child that if she gets into a car he will give her candy, and one who

> expressly or impliedly lets the child know that unless she gets into the car, he will make things unpleasant for her.

*Nanorta*, 742 A.2d at 178. Thus, in its zeal to find criminal liability, the trial court equated what is commonly termed a "threat" with a lure and the *Nanorta* panel adopted the trial court's reasoning giving it the imprimatur of Pennsylvania's middle level appeals court. This act can hardly be characterized as judicial restraint in interpretation.

¶ 17 Last in the trend of broad interpretation of the statute is the element of age. Notably, the term "child" is not defined in the statute or otherwise qualified by age in the definition of the crime. This contrasts with other offenses involving children, particularly sexual offenses, where the age of the child is explicitly set forth.[8] It also contrasts with the fact that two other offenses in the same Chapter of the Crimes Code do expressly define or set forth age parameters while utilizing the term "child," 18 Pa.C.S § 2904 (interference with the custody of children), and 18 Pa.C.S. § 2908 (missing children). Although the offense of luring evokes images of a pedophile sexual predator seeking out young children, say those 14 and under, in the only reported decision dealing with the issue, *Adamo*, we concluded that, despite the lack of an express definition of the term "child," the term included any person under the age of 18 years. In reaching this conclusion we pointed out the fact that the term "child" was expressly defined as anyone under 18 years of age in two other sections of the Kidnapping Chapter and that the various parts of the statute must be read in *pari materia*. *Adamo*, 637 A.2d at 305.[9]

¶ 18 Thus, a survey of the above holdings suggests that, as interpreted by this Court, the motive behind seeking to gain a child's entrance into a motor vehicle is completely immaterial with respect to the offense of luring. All that is required is a demonstration that a person sought to have a child enter the person's vehicle. As such, one can be found guilty of luring a child even if the intention of the driver was nothing more than to give the child a ride home or to another destination. Moreover, luring can be achieved not just by an offer of a reward or a pleasurable outcome tied to the child's entry into the vehicle, but also by a threat or command, a hand gesture that beckons a child toward a vehicle and possibly the mere offer of a ride home or to school under the right circumstances, *i.e.*, inclement weather. Lastly, "child" means not only young children who might be vulnerable to a predator, but teenagers up to and including those 17 years and 364 days old. By this definition, then, it also includes those old enough to legally consent to sex and those eligible to serve in the armed forces.

¶ 19 While many might believe that the legislature in enacting § 2910 and this Court in interpreting the statute broadly have taken an admirable step towards the protection of children, in reality, the concerted action of these two governmental bodies has created a legal minefield which essentially eliminates any distinction between the actions of a good Samaritan and a pedophile with designs upon a child or someone attempting a kidnapping for ransom. Since *Figueroa* holds that motive is immaterial to the offense and that one can

8. Some examples include: 18 Pa.C.S. § 6312, (sexual abuse of a child) ("knowingly permits a child under the age of 18 years"); 18 Pa.C.S. § 3121, (rape) (sexual intercourse with a complainant who is less than 13 years of age); 18 Pa.C.S. § 3122.1, (statutory sexual assault) (sexual intercourse with a complainant under the age of 16 years); 18 Pa.C.S. § 3123, (involuntary deviate sexual intercourse) (deviate sexual intercourse with a complainant who is less than 13 years of age); 18 Pa.C.S. § 3125, (aggravated indecent assault) (the complainant is less than 13 years of age or the complainant is less than 16 years of age and the person is four or more years older than the complainant).

9. Of course, to play devil's advocate, given that only two sections earlier in the same Chapter of the Crimes Code the term child was expressly defined, one might regard the failure to similarly define the term child in § 2910 as a curious, if not significant, omission that left the term open to judicial interpretation.

lure a child by merely offering a ride on an inclement day, we can conclude that a do-gooder mom, who picks her child up at school on a snowy, icy day, who then observes another child trudging home and offers the child a ride home has, under *Figueroa,* committed a *prima facie* violation of the statute. At the very least, a jury question would be presented as to whether or not the child's parent's consent is implied under the facts of the case. However, given the somewhat jaded world we live in, in which child abductions have been known to occur and have received widespread coverage by the media, can we safely assume that parental consent is implied under such circumstances? Moreover, since motive is immaterial, if the child's parent's consent is not implied, the do-gooder mom is just as guilty as a pedophile who is attempting to lure the child to force the child into a sexual encounter.

¶ 20 Undoubtedly, the retort that would be leveled at my criticism of the statute as interpreted in the above decisions is that no district attorney in the Commonwealth would ever prosecute such a case. This retort only heightens the infirmity of the statute. A law that theoretically criminalizes widely occurring behavior deemed innocent and/or acceptable by most in society and relies upon selective enforcement of the prosecutor to prevent gross injustice and rampant embarrassment to the Commonwealth is simply bad law (not to mention bad policy), if not unconstitutional law. In *Commonwealth v. Mikulan,* 504 Pa. 244, 470 A.2d 1339, 1342 (1983), although discussing the void for vagueness doctrine, our Supreme Court stated:

> The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

(quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983))(emphasis added). It is difficult to conceive of a crime currently existing in our Crimes Code that encourages arbitrary and discriminatory enforcement more than does the one under consideration here. One only need consider a few hypothetical examples of behavior that might be recurring on a frequent basis to illustrate how over-broadly the statute is drafted and how widespread selective prosecution must be with respect to this offense.

¶ 21 It is late-August and the first day of the new school year at the local high school. Johnny is a strapping, handsome 17 year-old senior and the starting quarterback on the school's football team who, although popular, has always been shy around girls. Johnny is also an All-State player with several big-time colleges eager to give him a scholarship and happens to be one of the most popular guys in school. High school dating politics being as they are, Johnny is the guy most of the girls swoon over and are "dying" to date. Situated in Johnny's first-period English class, is the cute new transferee (and new cheerleader), Jenny, also 17, who notices Johnny. Later Jenny's new friend Jan is more than happy to give Jenny "the scoop" on Johnny. Looking to gain instant clout in the social strata at school, Jenny decides to make a play for Johnny. As Johnny is walking through the school parking lot after football practice intent on catching the activities bus, Jenny, having just finished cheerleader practice, and dressed in tight shorts and a clinging t-shirt tied up to expose a bare midriff ala Brittney Spears, offers Johnny a ride home. Johnny accepts the invitation and climbs into Jenny's car. On the way home, the two hit it off and Jenny accepts an invitation for a date with Johnny. Soon, the two are an

"item" in school; a glamour couple whose status in the school is later confirmed when the two are named Homecoming King and Queen.

¶ 22 Forrest is a somewhat irascible older gentleman that lives on the far end of Elm Street. Forrest is a recluse who almost never interacts with the neighbors and when he has he has been a bit surly. Because of this, Forrest is viewed with great suspicion in the neighborhood and is not trusted by the residents of Elm Street. Although Forrest does not actively interact with the neighbors, he is a very alert individual and has a pretty strong awareness of who lives on his street. One day as Forrest is driving home in his pick-up truck, about a half-mile from Elm Street, he comes across Jimmy, a 15 year-old boy who lives a few doors down Elm Street from Forrest, kneeling next to his bicycle. Jimmy, it seems, has had some misfortune and his front tire is flat. Recognizing the boy from the neighborhood, Forrest stops and asks Jimmy if he would like a ride home. Jimmy is a bit hesitant, seeing as how he had often made fun of Forrest with the other neighborhood boys and had always considered Forrest "weird." But, since neither of his parents are home to come get him and he does not relish the idea of lugging the bike a half-mile home, Jimmy accepts the offer and places the disabled bike in the back of the pick-up truck. As he rides home with Forrest, Jimmy is somewhat surprised to find, contrary to his prior perception, that Forrest is a really nice and normal seeming man. Jimmy begins to feel pretty bad that he had made fun of Forrest so many times before. When Jimmy's mother gets home from work, Jimmy informs his mother that Forrest is a really great guy. Later when some of Jimmy's friends make rude references about Forrest, Jimmy sticks up for Forrest and chastises his friends for their prejudicial attitude.

¶ 23 Sam and Bill are 18–year–old recently graduated seniors from well-to-do families and are nearing the start of their freshman year in college. They want to enjoy one of the last weekends of summer before heading to college. So, on a warm August evening they jump into Sam's father's convertible Jaguar and decide to cruise "The Strip" downtown. The Strip is a three block section of a popular street where young males and females go to hang out and meet members of the opposite sex. The young men are well armed for their adventure as Sam's older brother purchased some beer for the boys. As Sam and Bill are cruising down The Strip, they come across two attractive young ladies sitting on a bench next to the road who seem to be paying a bit of attention to the young men. Bill and Sam lay down their best "rap" and the young ladies seem to be "eating it up." After about fifteen minutes of back and forth flirting, during which Sam and Bill learn that the girls are each 17 years of age and entering their senior year in high school, Sam tells the girls they have some beer and asks the girls if they would like to help them drink it. The girls readily accept and climb in the Jaguar. Not surprisingly, Sam and Bill, who have had many "conquests" throughout high school, including with underclass girls, are hoping to get "lucky" one last time before they head off to college. The foursome drive off to a secluded spot on the edge of town, consume the beer and, eventually, engage in consensual sexual activity.

¶ 24 James is a twice convicted pedophile who has already been designated a sexual predator. One day he rides in his car through the streets near a grade school with ill intent. He stops after seeing a nine year-old girl walking home by herself. After pulling up next to the girl, James tells the young girl that he works

with her mother, there has been an emergency at home, and that the girl's mother has sent him to pick her up. Although the girl has been taught by her parents not to accept rides from strangers, the girl believes James and climbs in the vehicle.

¶ 25 Based upon the above hypothetical scenarios, what can we surmise about Jenny, Forrest, Sam, Bill and James? Given the prevailing interpretations of 18 Pa.C.S. § 2910, a *prima facie* case of luring a child into a motor vehicle, a misdemeanor of the first degree, punishable by up to five years' imprisonment, would exist against each of the above hypothetical individuals even though arguably only one would have engaged in conduct that most of society would find worthy of criminal punishment and which, ostensibly, the offense was designed to address.

¶ 26 Analyzing each of these hypothetical scenarios *seriatim*, first we have Jenny, the high school cheerleader, offering Johnny a ride home. Jenny and Johnny have never met and Jenny deliberately dressed provocatively in an attempt to attract Johnny's attention and pique his interest, in other words, to lure him. Note that the statute prohibits any person from luring a child into a motor vehicle. The statute is not limited to an adult luring a child into a motor vehicle. Also note that the term child has been construed to include anyone under the age of 18. Consequently, if Jenny's provocative attire and offer of a ride is determined to be a lure, we have a *prima facie* violation of the statute and Jenny would be theoretically guilty of a misdemeanor–1 subject to up to

five years' imprisonment unless a jury concludes that Johnny's parents' consent to having their son ride with Jenny is implied under the facts of the case.[10] Can that consent be inferred from the facts of this hypothetical? What if Johnny's parents are very strict and "protective" of their son? Would the answer to either of the two questions above change if Jenny was willing to engage in some consensual sexual activity in order to "hook" Johnny?

¶ 27 Turning to Forrest who, as it turns out, has a heart of gold and only sought to help Jimmy out. Can the consent of Jimmy's parents be implied when everybody in the neighborhood perceived Forrest as a "weirdo" hermit? Will the courts construe Jimmy's flat tire as akin to walking in snowy weather making the offer of a ride "an inducement to gain" sufficient enough to turn the offer of a ride into a lure? And then we have Sam and Bill, and the many young men throughout the Commonwealth just like them. Like many young men, they are out looking for girls and hoping to gain physical intimacy from them. When they encounter two young ladies who appear interested, they offer the girls beer and the girls agree to go with Sam and Bill. It might be presumptuous of me to say, but I think that few parents would consent to their daughters riding off with two young men they just met who are after sex and are offering alcoholic beverages to their daughters. Taking this hypothetical one step further, and acknowledging that a significant percentage of minors engage in sexual activity,[11] any

---

10. Of course, if the literal wording of the offense is applied, a jury would have to conclude that Johnny's parents' consent to have Johnny lured into the car is implied in order to find Jenny not guilty.

11. According to an article on the matter published on the internet:

> Most young people in the United States begin having sexual intercourse during their teenage years. Current data suggest that slightly more than half of females and nearly two-thirds of males have had intercourse by their 18th birthday. In the last several decades there have been substantial increases in the proportion of adolescents

minors who have retreated to a motor vehicle to engage in consensual sex, or have entered a car in anticipation of going somewhere where consensual sex would later ensue, are arguably guilty of the offense in question.[12] This is so because, even if the two parties are dating and might otherwise have the implied consent of their parents to be in a motor vehicle with one another, it is difficult to infer that parental consent would be given if the minor is entering a motor vehicle for the purpose of engaging in sexual activity or to go somewhere to engage in sexual activity. Thus, if two young lovers entered a car with the explicit or implicit understanding that they would be engaging in sexual activity, each might be rightfully deemed guilty of "luring" the other into a motor vehicle.

¶ 28 Lastly, we turn to James in our hypothetical above. Undoubtedly, James is the quintessential individual that the statute was designed to address and interdict. However, since judicial interpretation in combination with the broad wording of the statute has eliminated any ill intent as an element of the offense, legally speaking, with respect to the offense under consideration, there is absolutely no distinction between his actions and those of Jenny, Forrest, Sam and Bill and the possibly thousands of individuals similarly acting in the Commonwealth. Thus, the prosecution of James, if the many other *prima facie* violators are not being similarly prosecuted, is indeed arbitrary, discriminatory and selective prosecution. That is,

such a prosecution is motivated by factors irrelevant to the definition of the offense, the exact consequence that *Mikulan* indicates should not be encouraged by the language of a criminal statute. This observation acts as an excellent precursor to discussing the facts of the present case and divining why Appellant was selectively prosecuted while many other *prima facie* violators are not.

¶ 29 It is patently clear from the facts of the case that Appellant did not seek to kidnap or abduct the young man at the center of this case. Although Appellant wisely declined to drive the complainant home after both became voluntarily intoxicated, there is no indication that the complainant was ever restrained or forced to stay with Appellant. Thus, one might wonder why Appellant has been singled out for prosecution for an offense which, as the above discussion demonstrates, is clearly violated on a frequent basis. Even though *Figueroa* indicates that intent is completely immaterial to the offense, viewing the facts of the present case in a light demonstrating the most "evil" of intents, we have a situation where Appellant, who is either bisexual or homosexual, was out "cruising" for potential paramours and came across a young man to whom he was attracted. Appellant, who the court found was acting under a reasonable belief that the complainant was 18 years of age or older, then asked the complainant if he would like a ride, most likely hoping that the two might hit it off and that the en-

---

who report sexual activity at each year of age. Increases have been greatest among females, especially among young females. Thus, more than twice as many females ages 14, 15, and 16 are sexually active now, compared with young women of the same ages just 15 years ago.
BEGINNING TOO SOON: Adolescent Sexual Behavior, Pregnancy and Parenthood, a Review of Research and Interventions. By Kris-

tin A. Moore, Brent C. Miller, Barbara W. Sugland, Donna Ruane Morrison, Dana A. Glei, Connie Blumenthal. *http:// aspe.os.dhhs.gov/hsp/cyp/xsteesex.htm*

12. This follows from the trial court's conclusion, which is difficult to disagree with, that an offer of sex constitutes a lure for purposes of the statute.

counter might become a more physically intimate one. On this occasion, if Appellant was indeed looking for physical intimacy, he got what he was looking for as the encounter did proceed to physical intimacy in the form of consensual oral sex with the complainant. If Appellant was "cruising" for potential romantic partners, what makes his actions any more criminal than those of Jenny or Sam and Bill? Given the elements of the offense and the way they have been interpreted, the answer is nothing. Indeed, Jenny, Sam and Bill are more culpable because they were aware that the object of their attraction and the subject of their advance was a minor. Here, Appellant did not. Thus, if the explanation for the prosecution in the present case is the fact that Appellant was "cruising" for romantic interests, to be fair, the Commonwealth should be prosecuting every person who has similarly "hit" on a stranger under the age of 18 and attempted to get them into their car.

¶ 30 Similarly, if Appellant was prosecuted for luring due to the fact that the encounter actually led to consensual sex, then by rights every individual, including other minors, who have engaged in consensual sex with a minor in a car or after driving the minor in a car to another place to have sex, should similarly be prosecuted for luring. Undoubtedly, this factor could implicate a fairly significant portion of the student body of our high schools or recently graduated students. Also, the prosecution and potential punishment imposed here is incongruous when one considers that had Appellant lived near the convenience store and been on foot when he met the complainant, and had the two met and a consensual sexual encounter followed, no criminal liability would have attached to the incident. Why should Appellant, or anyone else similarly situated, be subject to two to four years' imprisonment simply because the encounter started in a motor vehicle?

¶ 31 If the prosecution was motivated due to a discrepancy in age, it should be remembered that Appellant was found to have been operating under a reasonable belief that the complainant was 18 years of age or older. As such, Appellant was no more guilty than any other 50 year-old who tried to "hook up" with a young adult. Whatever the prosecutor may think of men or woman interested in partners much younger than they, any disdain for such a preference cannot be thought of as criminal and deserving of two to four years' imprisonment. Lastly, if the prosecution was motivated because of Appellant's sexual orientation, such a stance would certainly be unconstitutional in light of *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). In short, to the extent Appellant is guilty of luring a child into a motor vehicle, it is clear that a great many other individuals are also guilty of the offense, yet there is no effort expended to prosecute those individuals. As such, Appellant is clearly the victim of a selective prosecution. Although I have no way of divining why Appellant was prosecuted while many others are not, given the way in which the statute has been broadly interpreted, it is clear the decision is based upon factors that are outside the elements of the offense and, thus, should not be considerations in the prosecutorial decision.

¶ 32 The above discussion should illustrate that the offense in question is grossly overbroad and, without selective and discretionary prosecution, does not fulfill the objectives behind the legislation in any rational fashion. Moreover, the above discussion illustrates that the prosecution in the present case is arbitrary, discriminatory and selective, not to mention extremely unjust due to a lack of *mens rea.* Upon

the above, I would make a generalized plea for the legislature's reconsideration of the present offense.

¶ 33 Lastly, Appellant also challenges the sufficiency of the evidence to establish that he "lured" the complainant into a motor vehicle. Although the lead Opinion does not discuss this issue, I agree that the evidence was insufficient to establish that Appellant lured the minor into his automobile or his RV. According to the factual scenario laid out in the trial court's opinion, upon seeing the complainant and asking him where he was going, and after being told by the complainant that he was on his way home, Appellant offered the complainant a ride home. The complainant then accepted the ride. Shortly thereafter, after the complainant was already in the vehicle, Appellant asked the complainant if he liked to drink, to which the complainant responded, "yes." Appellant then drove to a local bar and purchased some beer while the complainant waited in the vehicle, apparently the complainant had no objection to Appellant's purchasing and then offering him beer. The two then went to Appellant's RV to consume the beer. After finishing the beer, and desiring more, the two men went to another bar where Appellant purchased additional beer and then returned to the RV to consume it.

¶ 34 As the previous discussion of *Adamo, supra., Nanorta, supra.,* established, absent extraordinary circumstances which might make the offer of a ride of extra benefit, the mere offer of a ride does not constitute a lure. In the present case, the trial court concludes that Appellant lured the complainant "numerous times throughout the night into two motor vehicles, enticing the young [complainant] initially with the offer of a ride home, and then, with the promise of cigarettes, alcohol,

and, finally, sexual favors." Trial Court Opinion, 12/16/03, at 4.

¶ 35 Since the complainant was close to home on a clement evening, the mere offer of a ride home cannot constitute a lure. With respect to the finding that the complainant was lured by the offer of alcohol and cigarettes, it is worth noting that the complainant was not initially "lured" into the vehicle by the offer of these substances as the trial court concluded that the offer of alcohol was not issued until after the complainant had accepted a ride home and entered the vehicle. Indeed, the record establishes that Appellant never even asked the complainant if he would like a drink. Rather, the record indicates that Appellant asked the complainant if he liked to drink, and when the complainant responded affirmatively, Appellant proceeded to a bar and purchased beer. As set forth then, the provision of beer was completely gratuitous and was not used as an inducement to get the complainant into the vehicle. As such, the initial entry into the vehicle was not accomplished through an offer, express or implied, of providing alcohol to the complainant.

¶ 36 I also cannot accept that subsequent entries into these vehicles constituted a luring of the complainant. It seems clear from the court's factual summary that the complainant voluntarily entered Appellant's car without any inducement or enticement whatsoever and, once inside the vehicle, consensually embarked upon a side-tracking adventure that included multiple stops to acquire and then consume alcohol and cigarettes. Thus, to assert that after the initial entry into the vehicle the complainant was subsequently "lured" into Appellant's car is disingenuous and ignores the common understanding of the term lure. The complainant had already demonstrated a complete willingness to ride with Appellant and demonstrated that

he was in no hurry to arrive home. His actions were completely consistent with acting along the initial, unconditional invitation of a ride home. From the moment the complainant entered the vehicle and then went to the bar with Appellant, the complainant's continuing welcome to ride with Appellant was implied and accepted by the complainant. As such, he was not lured into the vehicle as that term is commonly understood.

¶ 37 For example, if one offered a co-worker a ride home from work and along the way the two stopped at a bar for a drink, upon leaving the bar one would not expect the rider to have to ask his co-worker if he was going to still give him a ride home. The co-worker's invitation to continue riding with the driver would be implied. Conversely, if, after exiting the vehicle, the complainant expressed a reluctance to get back in the car with Appellant, and had Appellant offered alcohol to the complainant to get him to re-enter the vehicle, I would agree that the complainant had been lured into the vehicle. However, under the facts as found by the trial court, the complainant was not "lured" into Appellant's car at any time.

¶ 38 As for the entrance into Appellant's RV, while a RV is a motor vehicle, I believe the above analysis follows here as well. That is, Appellant had voluntarily entered Appellant's vehicle without any enticement other than an offer of a ride home. From that point on, the complainant operated under an implied invitation and never expressed any reluctance to being in Appellant's presence or engaging in drinking and smoking cigarettes. As such, the complainant was not "lured" into the RV as that term is generally understood.

¶ 39 Moreover, under the facts of this case, the RV, while technically a motor vehicle, was the same as Appellant's house or apartment, it was Appellant's place of residence and was immobile and inoperable for purposes of driving. N.T., 1/22/03, at 194. For the purposes of the two parties, it was merely a place to sit and relax. The RV was not being used for transportation and thus does not fall within the purview of the statute which obviously is designed to prohibit the "cruising" for unsuspecting children and the luring of them into a moving vehicle from which they can be easily transported away. Assuming that the complainant was not lured into Appellant's car as per the above analysis, it is incongruous that Appellant would violate the statute in question when he and the complainant voluntarily exited the car and entered a stationary RV, particularly when there would have been no criminal liability if the two had entered a house or apartment as opposed to the RV or if the two had simply remained in the car. As such, I do not believe the complainant was "lured" into a motor vehicle. As this is a necessary element of the offense, the conviction for luring could also be reversed on this ground.

STEVENS, J., Dissenting.:

¶ 1 I respectfully dissent from the majority's decision to reverse the trial court's judgment of sentence on Appellant's conviction for luring a child into a motor vehicle.

¶ 2 The offense of luring a child into a motor vehicle is defined in 18 Pa.C.S.A. § 2910, which provides that: "A person who lures a child into a motor vehicle without the consent, express or implied, of the child's parent or guardian, unless the circumstances reasonably indicate the child is in need of assistance, commits a misdemeanor of the first degree." 18 Pa. C.S.A. § 2910. In *Commonwealth v. Figueroa*, 436 Pa.Super. 569, 648 A.2d 555 (1994), this Court, in analyzing § 2910, stated that:

[C]riminal intent or guilty knowledge is an essential element of a criminal offense, though the legislature may define a crime so that proof of criminal intent or guilty knowledge is unnecessary. In such case, the culpability or *mens rea* is established by proof that the person acted intentionally, knowingly or recklessly.

The gravamen of the present crime is luring a child into a motor vehicle. We have stated above that inviting the children into [an individual's] car with a promise of a ride to school or the bus stop ... is sufficient to meet the prohibition of the statute. This knowing conduct we believe meets the requirement of culpability. That there may have been no intent to harm is not relevant since this is not a requirement of the act.

*Id.* at 557–558.

¶ 3 As noted by the majority, in interpreting § 2910, the *Figueroa* Court imputed strict liability with respect to the intent to harm. I would also impute strict liability to the age element in that the statute at issue does not specifically provide a mistake of age defense. In order to give full effect to the intention of the Legislature, I would find that luring a child into a motor vehicle is a strict liability offense, which may be committed regardless of a defendant's motive, and that the Act does not require a showing of intent to harm. Accordingly, I would affirm the judgment of sentence.